**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**

**BRYAN P. SPENCE,** *et al.,*

　　　　*Plaintiffs,*

v.

**LLOYD J. AUSTIN III,** *et al.,*

　　　　*Defendants.*

Case No. 4:22-cv-00453

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY**
**RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION.................................................................................................................1

BACKGROUND................................................................................................................ 2

I.  The COVID-19 Pandemic ..................................................................................... 2

II.  Department of Defense Vaccination Directives .................................................3

III.  The Department of the Air Force's Implementation of the COVID-19 Vaccination
     Directive .................................................................................................................4

     A.  Exemptions ....................................................................................................5

     B.  Refusal to Vaccinate ....................................................................................6

IV.  The Instant Action .................................................................................................8

V.  Other Litigation Over the Military's Vaccination Requirement.........................9

LEGAL STANDARDS......................................................................................................10

ARGUMENT.................................................................................................................... 11

I.  Plaintiffs Are Unlikely to Succeed on the Merits of Their Claims. ..................11

     A.  Plaintiffs' Claims Are Not Ripe. ................................................................11

     B.  Plaintiffs' Claims are Not Justiciable Because They Failed to Exhaust Their
          Administrative Remedies.............................................................................15

     C.  Plaintiffs' Assignment Claims Are Not Justiciable. ..................................16

     D.  Plaintiffs Lack Venue in this District, and Are Improperly Joined...................18

     E.  Plaintiffs Are Unlikely to Succeed on the Merits of Their RFRA Claims. ...................18

          1.  Vaccinating Plaintiffs Against COVID-19 Furthers the Government's
               Compelling Interests. ...................................................................19

          2.  Vaccination is the Least Restrictive Means of Furthering the
               Government's Compelling Interest in Military Readiness.....................32

     F.  Plaintiffs' First Amendment Claims Are Unlikely to Succeed on the Merits. ...............35

II.  Plaintiffs Do Not Face Irreparable Harm. .......................................................39

III.     The Equities and the Public Interest Weigh Against a Preliminary Injunction. ..........................42

IV.      Any Relief Should Be Narrowly Tailored. .........................................................................44

**CONCLUSION** ..........................................................................................................................**45**

# TABLE OF AUTHORITIES

*303 Creative LLC v. Elenis,*
  6 F.4th 1160, 1187 (10th Cir. 2021),
  *cert. granted in part,* 142 S. Ct. 1106 (2022) ............................................................................................37

*Abbott Labs. v. Gardner,*
  387 U.S. 136 (1967) ............................................................................................................................12

*Air Force Officer v. Austin,*
  --- F. Supp. 3d --, 2022 WL 468799 (M.D. Ga. Feb. 15, 2022).........................................................10, 40

*Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.,*
  878 F.2d 806 (5th Cir. 1989) ...............................................................................................................10

*Anderson v. Jackson,*
  556 F.3d 351 (5th Cir. 2009) ...............................................................................................................10

*Antonellis v. United States,*
  723 F.3d 1328 (Fed. Cir. 2013) ...........................................................................................................17

*Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.,*
  897 F.3d 314 (D.C. Cir. 2018),
  *cert. denied,* 140 S. Ct. 1198 (2020) .....................................................................................................40

*Austin v. U.S. Navy SEALs 1–26,*
  142 S. Ct. 1301 (2022) ..................................................................................................................*passim*

*Austin v. U.S. Navy SEALs 1–26,*
  No. 4:21-cv-01236-O, 2022 WL 1025144 (N.D. Tex. Mar. 28, 2022),
  appeal filed No. 22-10534 (5th Cir. May 27, 2022).............................................................................10, 17

*Bauer v. Summey,*
  --- F. Supp. 3d --, 2021 WL 4900922 (D.S.C. Oct. 21, 2021) .............................................................31

*Bellinger v. Bowser,*
  288 F. Supp. 3d 71 (D.D.C 2017)........................................................................................................40

*Biden v. Missouri,*
  142 S. Ct. 647 (2022) .........................................................................................................................31

*Bois v. Marsh,*
  801 F.2d 462 (D.C. Cir. 1986)..............................................................................................................40

*Bors v. Allen,*
  607 F. Supp. 2d 204 (D.D.C. 2009)......................................................................................................42

*Bryant v. Gates,*
    532 F.3d 888 (D.C. Cir. 2008) ........................................................................................19

*Burwell v. Hobby Lobby Stores, Inc.,*
    573 U.S. 682 (2014) ................................................................................................32, 33

*Cargill v. Marsh,*
    902 F.2d 1006 (D.C. Cir. 1990) .....................................................................................17

*Chappell v. Wallace,*
    462 U.S. 296 (1983) .......................................................................................................44

*Chilcott v. Orr,*
    747 F.2d 29 (1st Cir. 1984) ............................................................................................40

*Choice Inc. of Tex. v. Greenstein,*
    691 F.3d 710 (5th Cir. 2012) ..........................................................................................12

*Church v. Biden,*
    --- F. Supp. 3d ---, 2021 WL 5179215 (D.D.C. Nov. 8, 2021) ...............................*passim*

*Cortright v. Resor,*
    447 F.2d 245 (2d Cir. 1971) ...........................................................................................17

*Creaghan v. Austin,*
    No. 22-cv-0981 (CKK), 2022 WL 1500544 (D.D.C. May 12, 2022),
    *appeal filed*, No. 22-5135 (D.C. Cir. May 20, 2022) ..........................................9, 20, 41

*Daniels Health Scis., LLC v. Vascular Health Scis., LLC,*
    710 F.3d 579 (5th Cir. 2013) ..........................................................................................39

*Diraffael v. Ca. Mil. Dep't,*
    No. 10-cv-7240, 2011 WL 13274364 (C.D. Cal. Mar. 21, 2011) ...................................13

*Doe #1-#14 v. Austin,*
    --- F. Supp. 3d ---, 2021 WL 5816632 (N.D. Fla. Nov. 12, 2021).................................9

*Doe v. San Diego Unified Sch. Dist.,*
    19 F.4th 1173 (9th Cir. 2021),
    *cert. and application for injunction denied*, 142 S. Ct. 1099 (2022).......................*passim*

*Does 1–6 v. Mills,*
    16 F.4th 20 (1st Cir. 2021),
    *cert. denied, Does 1-3 v. Mills*, 142 S. Ct. 1112 (2022). ..............................26, 32, 35, 38

*Doster v. Kendall,*
    --- F. Supp. 3d ---, 2022 WL 982299 (S.D. Ohio Mar. 31, 2022)...................................10

iv

*Dunn v. Austin,*
   142 S. Ct. 1707 (2022) ....................................................................................... 2, 9, 43

*Elrod v. Burns,*
   427 U.S. 347 (1976) ............................................................................................. 40

*Emp. Div., Dep't of Health & Hum. Res. of Or. v. Smith,*
   494 U.S. 872 (1990) ............................................................................................. 37

*Farmer v. Mabus,*
   940 F.2d 921 (5th Cir. 1991) ............................................................................... 11

*Fulton v. City of Philadelphia,*
   141 S. Ct. 1868 (2021) ...................................................................................... 36, 37

*Gill v. Whitford,*
   138 S. Ct. 1916 (2018) ......................................................................................... 44

*Gilligan v. Morgan,*
   413 U.S. 1 (1973) ............................................................................................. *passim*

*Goldman v. Weinberger,*
   475 U.S. 503 (1986) .......................................................................................... *passim*

*Guerra v. Scruggs,*
   942 F.2d 270 (4th Cir. 1991) ............................................................................... 43

*Guettlein v. U.S. Merch. Marine Acad.,*
   --- F. Supp. 3d ---, 2021 WL 6015192 (E.D.N.Y. Dec. 20, 2021) ........................ 9

*Guitard v. Sec'y of Navy,*
   967 F.2d 737 (2d Cir. 1992) ................................................................................ 40

*Harkness v. Sec'y of Navy,*
   858 F.3d 437 (6th Cir. 2017) ............................................................................... 17

*Hartikka v. United States,*
   754 F.2d 1516 (9th Cir. 1985) ............................................................................. 40

*Hodges v. Callaway,*
   499 F.2d 417 (5th Cir. 1974) ........................................................................ 12, 15, 16

*Holland Am. Ins. Co. v. Succession of Roy,*
   777 F.2d 992 (5th Cir. 1985) ............................................................................... 39

*Huawei Techs. USA, Inc. v. FCC,*
   2 F.4th 421 (5th Cir. 2021) ................................................................................. 12

*Janvey v. Alguire*,
   647 F.3d 585 (5th Cir. 2011) ...........................................................................39

*Johnson v. Reed*,
   609 F.2d 784 (5th Cir. 1980) ...........................................................................17

*Kaemmerling v. Lappin*,
   553 F.3d 669 (D.C. Cir. 2008) ....................................................................33, 36

*Kane v. De Blasio*,
   19 F.4th 152 (2d Cir. 2021) .........................................................................37, 38

*La. Power & Light Co. v. Fed. Power Comm'n*,
   526 F.2d 898 (5th Cir. 1976) ...........................................................................12

*Larsen v. U.S. Navy*,
   486 F. Supp. 2d 11 (D.D.C. 2007) ....................................................................44

*Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*,
   510 F.3d 253 (3d Cir. 2007) ............................................................................37

*Lopez v. City of Houston*,
   617 F.3d 336 (5th Cir. 2010) ...........................................................................12

*Mark Short v. Berger*,
   No. 22-cv-1151, 2022 WL 1051852 (C.D. Cal. Mar. 3, 2022) .........................*passim*

*Mazares v. Dep't of Navy*,
   302 F.3d 1382 (Fed. Cir. 2002) ........................................................................11

*Mazurek v. Armstrong*,
   520 U.S. 968 (1997) ........................................................................................10

*McCurdy v. Zuckert*,
   359 F.2d 491 (5th Cir. 1966) ...........................................................................40

*Meister v. Tex. Adjutant General's Dep't*,
   233 F.3d 332 (5th Cir. 2000) ...........................................................................15

*Mindes v. Seaman*,
   453 F.2d 197 (5th Cir. 1971) ......................................................................15, 17

*Miss. Power & Light Co. v. United Gas Pipe Line Co.*,
   760 F.2d 618 (5th Cir. 1985) ...........................................................................10

*Monk v. Huston*,
   340 F.3d 279 (5th Cir. 2003) ...........................................................................12

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
538 U.S. 803 (2003) ...................................................................................................13

*Navy SEAL 1 v. Austin*,
--- F. Supp. 3d ---, 2022 WL 1294486 (D.D.C. Apr. 29, 2022),
*appeal filed*, No. 22-5114 (D.C. Cir. May 5, 2022)...................................................*passim*

*Navy SEAL 1 v. Biden*,
No. 8:21-cv2429, 2022 WL 483832 (M.D. Fla. Feb. 2, 2022) ....................................10

*Navy SEALs 1–26 v. Biden*,
--- F. Supp. 3d ---, 2022 WL 34443 (N.D. Tex. Jan. 3, 2022),
*denying stay pending appeal* 27 F.4th 336 (5th Cir. Feb. 28, 2022),
*granting stay sub nom., Austin v. Navy SEALs 1-26*, 142 S. Ct. 1301 (2022) ................................10, 16, 17

*Nken v. Holder*,
556 U.S. 418 (2009) ............................................................................................39, 42

*Norris v. Stanley*,
No. 1:21-cv-756, 2022 WL 557306 (W.D. Mich. Feb. 22, 2022),
*appeal filed*, No. 22-1200 (6th Cir. Mar. 14, 2022) ...................................................31

*North Dakota v. United States*,
495 U.S. 423 (1990) ...................................................................................................42

*Oklahoma v. Biden*,
--- F. Supp. 3d ---, 2021 WL 6126230 (W.D. Okla. Dec. 28, 2021) ...............................9, 24, 43

*Orloff v. Willoughby*,
345 U.S. 83 (1953) .........................................................................................17, 19, 44

*Parrish v. Brownlee*,
335 F. Supp. 2d 661 (E.D.N.C. 2004)........................................................................42

*Poffenbarger v. Kendall*,
--- F. Supp. 3d ---, 2022 WL 594810 (S.D. Ohio Feb. 28, 2022),
*appeal filed*, No. 22-3413 (6th Cir. May 3, 2022)...............................................10, 44

*Qualls v. Rumsfeld*,
357 F. Supp. 2d 274 (D.D.C. 2005)............................................................................42

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
141 S. Ct. 63 (2020)............................................................................................19, 39

*Robert v. Austin*,
No. 21-cv-02228, 2022 WL 103374 (D. Colo. Jan. 11, 2022) ....................................9

*Roberts v. Roth,*
　No. 21-cv-1797, 2022 WL 834148 (D.D.C. Mar. 21, 2022) .................................................9, 15

*Rostker v. Goldberg,*
　453 U.S. 57 (1981) .................................................................................................................11

*Roth v. Austin,*
　No. 8:22CV3038, 2022 WL 1568830 (D. Neb. May 18, 2022),
　*appeal filed*, No. 22-2058 (8th Cir. May 20, 2022).....................................................*passim*

*S. Bay United Pentecostal Church v. Newsom,*
　140 S. Ct. 1613 (2020) ...........................................................................................................20

*Sampson v. Murray,*
　415 U.S. 61 (1974) .............................................................................................................39, 40

*Schlanger v. United States,*
　586 F.2d 667 (9th Cir. 1978) .................................................................................................17

*Schlesinger v. Ballard,*
　419 U.S. 498 (1975) ...............................................................................................................11

*Sebra v. Neville,*
　801 F.2d 1135 (9th Cir. 1986) ...............................................................................................17

*Shrimpers & Fisherman of the RGV v. U.S. Army Corps of Eng'rs,*
　849 F. App'x 459 (5th Cir. 2021) ..........................................................................................12

*Smith v. Harvey,*
　541 F. Supp. 2d 8 (D.D.C. 2008) ..........................................................................................15

*Solorio v. United States,*
　483 U.S. 435 (1987) ...............................................................................................................11

*South Bay United Pentecostal Church v. Newsom,*
　141 S. Ct. 716, 717 (2021) .....................................................................................................41

*Standage v. Braithwaite,*
　526 F. Supp. 3d 56 (D. Md. 2021).........................................................................................13

*Stein v. Mabus,*
　No. 3:12-cv-00816, 2013 WL 12092058 (S.D. Cal. Feb. 14, 2013) .....................................43

*Tandon v. Newsom,*
　141 S. Ct. 1294 (2021) ......................................................................................................25, 41

*Thomas Short v. Berger,*
    No. 22-cv-00444, 2022 WL 1203876 (D. Ariz. Apr. 22, 2022),
    *appeal filed*, No. 22-15755 (9th Cir. May 18, 2022) ........................................................9, 11, 40, 41

*Thomas v. Union Carbide Agric. Prods. Co.,*
    473 U.S. 568 (1985) ...........................................................................................................................12

*Toilet Goods Association v. Gardner,*
    387 U.S. 158 (1967) ...........................................................................................................................14

*TOTAL Gas & Power N. Am., Inc. v. Fed. Energy Regulatory Comm'n,*
    859 F.3d 325 (5th Cir. 2017) .............................................................................................................11

*Trump v. Hawaii,*
    138 S. Ct. 2392 (2018) ...........................................................................................................36, 37, 44

*United States. v. Hardy,*
    46 M.J. 67 (C.A.A.F. 1997) ...............................................................................................................43

*United States v. Christie,*
    825 F.3d 1048 (9th Cir. 2016) ...........................................................................................................29

*United States v. Elder,*
    No. 18-cr-92, 2022 WL 836923 (E.D.N.Y. Mar. 21, 2022) ..............................................................34

*United States v. O'Brien,*
    391 U.S. 367 (1968) ...........................................................................................................................19

*United States v. Stark,*
    No. NMCM200000243, 2000 WL 1456299 (N-M. Ct. Crim. App. Aug. 31, 2000) ..........................43

*Valdez v. Grisham,*
    559 F. Supp. 3d 1161 (D.N.M. 2021),
    *appeal filed*, No. 21-2105 (10th Cir. Sept. 15, 2021) .....................................................................32

*Vance v. Wormuth,*
    No. 3:21-cv-730-CRS, 2022 WL 1094665 (W.D. Ky. Apr. 12, 2022)...........................................9, 13, 15

*Von Hoffburg v. Alexander,*
    615 F.2d 633 (5th Cir. 1980)..........................................................................................................12, 15

*Wayte v. United States,*
    470 U.S. 598 (1985) ...........................................................................................................................19

*We The Patriots USA, Inc. v. Hochul,*
    17 F.4th 266 (2d Cir. 2021),
    *application for injunction denied, Dr. A. v. Hochul,* 142 S. Ct. 552 (2021) ..................................32, 36, 38, 39

*White v. Carlucci,*
  862 F.2d 1209 (5th Cir. 1989) ........................................................................................39

*Wilson v. Walker,*
  777 F.2d 427 (8th Cir. 1985) ..........................................................................................17

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ...................................................................................................*passim*

## STATUTES

28 U.S.C. § 1406 ..................................................................................................................18

42 U.S.C. § 2000bb-1(b)...............................................................................................18, 20

42 U.S.C. § 2000bb-1(b)(2) ................................................................................................25

Pub. L. No. 117-81, 135 Stat. 1541 (2021)........................................................................7

## OTHER AUTHORITIES

AFI 36-3206, Administrative Discharge Procedures for Commissioned Officers, Chapter 7,
  https://perma.cc/75UU-DDE5.......................................................................................7

Air Force Instruction ("AFI") 48-110_IP, Table D-1 (Feb. 16, 2018),
  https://perma.cc/82YE-EA3U........................................................................................4

CDC, *COVID Data Tracker* (June 8, 2022),
  https://perma.cc/MQ7S-2EZG?view-mode=server-side&type=image.................................3

CDC, *Delta Variant: What We Know About the Science* (updated Aug. 26, 2021),
  https://perma.cc/4RW6-7SGB)......................................................................................3

CDC, *How COVID-19 Spreads* (updated July 14, 2021),
  https://perma.cc/4ZBC-8WYQ......................................................................................3

CDC, *Interim Clinical Considerations for Use of COVID-19 Vaccines Currently Approved or
  Authorized in the United States* (last updated Apr. 21, 2022),
  https://perma.cc/3646-DC3S........................................................................................31

CDC, Morbidity and Mortality Weekly Report (Mar. 18, 2022),
  https://perma.cc/HJH3-PEN4.......................................................................................24

CDC, *Omicron Variant: What You Need to Know* (updated Feb. 2, 2022),
  https://perma.cc/LTZ6-YTDH......................................................................................3

Centers for Disease Control and Prevention ("CDC"), *COVID-19,*
  https://perma.cc/A9D5-AUHV.......................................................................................3

Cong. Rsch. Serv., *Defense Health Primer: Military Vaccinations* (updated Aug. 6, 2021),
  https://crsreports.congress.gov/product/pdf/IF/IF11816/2 ....................................................................3

DAF COVID-19 Statistics - January 2022,
  https://perma.cc/BJ9D-7AJ4 ...................................................................................................26

DAF COVID-19 Statistics – June 7, 2022,
  https://perma.cc/RP7X-2669 ............................................................................................*passim*

Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19)
  Outbreak, Pres. Proc. No. 9994, 85 Fed. Reg. 15,337 (Mar. 18, 2020) .....................................3

DoDI 1332.45,
  https://perma.cc/9FNU-ZR89 ............................................................................................4, 27

DoDI 6025.19,
  https://perma.cc/TR75-JRVD. DoD ...........................................................................................4

DoDI 6205.02,
  https://perma.cc/8HLA-AXQB ......................................................................................3, 4, 31

FDA, *Antibody (Serology) Testing for COVID-19: Information for Patients and Consumers* (Feb. 24, 2022),
  https://perma.cc/WY9T-6LSG ..................................................................................................31

FDA, *Antibody Testing Is Not Currently Recommended to Assess Immunity After COVID-19 Vaccination:
  FDA Safety Communication* (May 19, 2021),
  https://perma.cc/X8GQ-TNHQ .................................................................................................31

FDA, *News Release – FDA Approves First COVID-19 Vaccine* (Aug. 23, 2021),
  https://perma.cc/C4DD-PWE5 ..................................................................................................30

H.R. Rep. No. 103-88 (1993) .............................................................................................................19

Joint Explanatory Statement to FY 2022 NDAA,
  https://perma.cc/FL8K-PFUU ...................................................................................................26

Memo. re: COVID-19 Vaccination Status and Formal Training (Aug. 31, 2021),
  https://perma.cc/RB7U-DFQC ..................................................................................................27

S. Rep. No. 103-111 (1993) ...............................................................................................................19

Sec'y of Air Force Mem. (Sept. 3, 2021),
  https://perma.cc/6E2W-3EQM .............................................................................................4, 20

Sec'y of Def. Mem. (Aug. 9, 2021),
  https://perma.cc/S4R3-2VZW .........................................................................................4, 20, 30

Sec'y of Def. Mem. (Aug. 24, 2021),
    https://perma.cc/N759-S758.................................................................................4, 20, 30, 36

Stanley Lemon, et al., *Protecting Our Forces: Improving Vaccine Acquisition and
    Availability in the U.S. Military*, National Academies Press, 2002,
    https://perma.cc/E545-TQ9G.................................................................................3

# INTRODUCTION

In warfare, disease has historically accounted for more service member deaths than battlefield injuries, and a healthy fighting force has long been a key part of America's military readiness. Prior to the COVID-19 pandemic, the Department of Defense's ("DoD") decades-old immunization program required that all service members obtain a least nine immunizations, and an additional eight depending on circumstances. In the midst of a deadly pandemic that has killed almost one million Americans, and seeking to protect the health and readiness of the Armed Forces by reducing the risk of infections, hospitalizations, and deaths among service members, DoD added vaccination against COVID-19 to this long list of immunizations already required for service members.

Plaintiffs—nine members of the United States Air Force—challenge the Air Force's COVID-19 vaccination requirement as inconsistent with their religious beliefs in violation of the Religious Freedom Restoration Act ("RFRA") and the Free Exercise Clause of the First Amendment. Plaintiffs request that the Court enjoin the COVID-19 vaccination requirement and—in direct contradiction to the Supreme Court's recent stay order, *see Austin v. U.S. Navy SEALs 1–26*, 142 S. Ct. 1301, 1302 (2022) (mem.)—that the Court enjoin the Air Force from taking "any adverse action against any servicemembers" on the basis of vaccination status, including assignment and deployability decisions. *See* Pls.' Mot. for TRO/PI ("Mot."), 2–3, Dkt. 14-1. Plaintiffs' motion fails to satisfy any of the grounds for extraordinary injunctive relief and should be denied.

As an initial matter, the claims of diverse Plaintiffs are improperly joined where only two of the nine Plaintiffs have venue in this district. This Court should therefore sever the remaining seven Plaintiffs as improperly joined and transfer their claims to the proper venue. Moreover, none of the Plaintiffs have been subjected to any administrative action for their failure to obey their vaccination orders and, thus, none of their claims are ripe or exhausted. Extensive military procedures remain available to them to challenge the vaccination order and any future administrative actions. This defect alone warrants denial of the motion. Moreover, their claims related to assignments are not justiciable.

Nor can Plaintiffs demonstrate likely success on the merits of their claims. The vaccination requirement satisfies RFRA because the Air Force has an extraordinarily compelling interest in military readiness and the health and readiness of its forces—Plaintiffs included—and no less restrictive measure serves those interests equally well as vaccination. The Air Force's religious accommodation process is not a sham: the Air Force has granted 109 religious accommodations to date. DAF COVID-19 Statistics – June 7, 2022, https://perma.cc/RP7X-2669. That Plaintiffs cannot show likely success on the merits is even more evident with application of the well-established deference afforded to the military's professional judgments concerning the importance of particular military interests and an assessment of acceptable military risk. Indeed, the Supreme Court recently granted the government's request for a partial stay of a preliminary injunction that had prevented the Navy from making assignment decisions that take service members' vaccination status into account. As Justice Kavanaugh emphasized in his concurrence, "[u]nder Article II of the Constitution, the President of the United States, not any federal judge, is the Commander in Chief of the Armed Forces," and there is no basis to "employ[] the judicial power in a manner that military commanders believe would impair the military of the United States as it defends the American people." *Navy SEALs 1–26*, 142 S. Ct. at 1302 (Kavanaugh, J., concurring). The Supreme Court also recently denied a service member's request for an injunction pending appeal in a case asserting RFRA and First Amendment claims against the military's vaccination requirement. *Dunn v. Austin*, 142 S. Ct. 1707 (2022) (mem.).

Finally, Plaintiffs have neither demonstrated irreparable injury nor shown that the balance of equities and public interest weigh in their favor. Accordingly, for the reasons set forth further below, the Court should deny Plaintiffs' motion.

## BACKGROUND

### I.    The COVID-19 Pandemic

The virus SARS-CoV-2 causes a respiratory disease known as COVID-19 that can result in severe symptoms and death. *See* Centers for Disease Control and Prevention ("CDC"), *COVID-19*,

https://perma.cc/A9D5-AUHV.[1] COVID-19 has infected more than 84 million Americans and has killed over one million. *See* CDC, *COVID Data Tracker* (June 8, 2022), https://perma.cc/MQ7S-2EZG?view-mode=server-side&type=image. To date, 96 service members have died from COVID-19, and nearly 400,000 have contracted the disease. Ex. 1, Decl. of Maj. Scott Stanley ¶ 3, App.3. Of those 96 service members, only two were fully vaccinated. *Id.* Many otherwise healthy service members became seriously ill or developed "long-haul" COVID-19, potentially affecting their long-term ability to perform their missions. Ex. 2, Decl. of Col. Tonya Rans, M.D. ¶¶ 9–10, App.17–22.

## II.    Department of Defense Vaccination Directives

Vaccines have played a longstanding and important role in America's military readiness.[2] DoD's current immunization program is governed by DoD Instruction ("DoDI") 6205.02 (July 23, 2019), https://perma.cc/8HLA-AXQB. Under the program, nine vaccines are required for all service members, including the annual influenza vaccine, while eight others are required when certain elevated risk factors are present. *See* Air Force Instruction ("AFI") 48-110_IP, Table D-1 (Feb. 16, 2018),

---

[1] COVID-19 "spreads when an infected person breathes out droplets and very small particles that contain the virus." CDC, *How COVID-19 Spreads* (updated July 14, 2021), https://perma.cc/4ZBC-8WYQ. It has caused a global pandemic and spread rapidly throughout the United States, leading the President to declare a national emergency. Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, Pres. Proc. No. 9994, 85 Fed. Reg. 15,337 (Mar. 18, 2020). In July 2021, the United States began to experience "a rapid and alarming rise in . . . COVID-19 case[s] and hospitalization rates," driven by an especially contagious strain known as the Delta variant. *See* CDC, *Delta Variant: What We Know About the Science* (updated Aug. 26, 2021), https://perma.cc/4RW6-7SGB. More recently, the highly transmissible Omicron variant caused a steep rise in cases and a surge in hospitalizations. *See* CDC, *Omicron Variant: What You Need to Know* (updated Feb. 2, 2022), https://perma.cc/LTZ6-YTDH.

[2] Military deaths due to infectious diseases outnumbered those due to direct combat injuries until World War II, when vaccines became widespread. Stanley Lemon, et al., *Protecting Our Forces: Improving Vaccine Acquisition and Availability in the U.S. Military* at 3, National Academies Press, 2002, https://perma.cc/E545-TQ9G. Even recently, disease accounted for nearly 70% of U.S. Army hospital admissions during the Persian Gulf War. *Id.* at 10, Figure 1-1. Military-mandated vaccines mitigate this threat and reduce infectious disease morbidity and mortality among military personnel. *Id.* at 10–11 (highlighting the historical use of vaccines in armed conflict). The U.S. military instituted its first immunization program in 1777 when General Washington directed the inoculation of the Continental Army for smallpox. *Id.* at 12, Table 1-1. And for the past several decades, the military has implemented a variety of enduring or situational inoculation measures to maintain the readiness of its force. Cong. Rsch. Serv., *Defense Health Primer: Military Vaccinations* (updated Aug. 6, 2021), https://crsreports.congress.gov/product/pdf/IF/IF11816/2.

https://perma.cc/82YE-EA3U. It is part of DoD's overarching requirement that each service member be medically ready for service and mobilization, called Individual Medical Readiness. *See* DoDI 6025.19, https://perma.cc/TR75-JRVD. DoD has determined that "[t]o maximize the lethality and readiness of the joint force, all Service members are expected to be deployable." DoDI 1332.45 ¶ 1.2, https://perma.cc/9FNU-ZR89. DoD generally aligns its immunization requirements and eligibility determinations for service members with recommendations from the CDC and its Advisory Committee on Immunization Practices. DoDI 6205.02 at 3, https://perma.cc/8HLA-AXQB. The military's service branches have separately issued regulatory guidance for administering vaccines to service members, including processes to seek medical and religious exemptions. *See* AFI 48-110_IP, Ch. 2-6, https://perma.cc/82YE-EA3U.

On August 9, 2021, the Secretary of Defense, noting the impact of COVID-19 on military readiness and concluding that vaccination "will ensure we remain the most lethal and ready force in the world," announced that he would add the COVID-19 vaccine to the list of vaccines required for all service members by the earlier of mid-September 2021 or upon approval by the Food and Drug Administration ("FDA"). *See* Sec'y of Def. Mem. (Aug. 9, 2021), https://perma.cc/S4R3-2VZW. On August 24, 2021, one day after FDA announced the approval of the Pfizer vaccine, the Secretary directed the Secretaries of the Military Departments to immediately ensure that all members of the armed forces under DoD authority were fully vaccinated against COVID-19. *See* Sec'y of Def. Mem. (Aug. 24, 2021), https://perma.cc/N759-S758.

## III.   The Department of the Air Force's Implementation of the COVID-19 Vaccination Directive

Shortly after the Secretary of Defense issued his vaccine directive, the Department of the Air Force issued its initial implementing guidance. *See* Sec'y of Air Force Mem. (Sept. 3, 2021), https://perma.cc/6E2W-3EQM. The Secretary of the Air Force directed all active duty service members to be vaccinated by November 2, 2021. *Id.*

A.  Exemptions

As with other vaccine requirements, Department guidance establishes processes for seeking medical, administrative, and religious exemptions. *See* Ex. 3, Decl. of Lt. Col. David R. Sayers ¶¶ 5–11, App.61–64; Ex. 4, Decl. of Maj. Matthew Streett ¶ 3, App.72; Ex. 5, Decl. of Lt. Col. Nekitha Little ¶¶ 3–4, App.81–82. Members may seek a temporary medical exemption if, for example, they currently have COVID-19, are pregnant, or are allergic to a vaccine ingredient. Ex. 3 ¶ 6, App.62. The Department currently has 337 approved medical exemptions among active duty members and 172 among reserve members. DAF COVID-19 Statistics – June 7, 2022, https://perma.cc/RP7X-2669; Ex. 3 ¶ 20, App.68 (providing statistics as of June 5, 2022).[3]

Service members may seek a religious exemption by submitting a written request to the approval authority.[4] Ex. 4 ¶ 4, App.73. The service member then consults with a chaplain, his commander, and a military medical provider, who each provide written memoranda of their respective meetings to include in the request package. *Id.* ¶ 8. Although chaplains may make recommendations, they lack authority to approve or deny exemption requests. *Id.* ¶ 9. A separate legal review of the package is also conducted. *Id.* ¶ 10. Multidisciplinary Religious Resolution Teams at both the installation level and the approval authority level, led by the senior base chaplain, then review the package to advise the approval authority regarding the resolution of religious liberty matters. *Id.* ¶¶ 7–8, 10. After reviewing the request package, the team provides a written recommendation that includes any dissenting views of any members of the team. *Id.* ¶ 10. The team is not authorized to approve or deny requests. *Id.* ¶ 12. The request package is then routed through each commander in the chain of command, with each providing an endorsement with a recommendation to approve or disapprove the

---

[3] Members who are on terminal leave (*i.e.*, they are no longer coming into their workspace and are taking leave until the date they retire or separate from service) or who are otherwise retiring or separating from military service in the near future may also seek an exemption. Ex. 5 ¶¶ 3–4, App.81–82. The Department currently has 25 such exemptions for active duty members and 89 for reserve members. DAF COVID-19 Statistics – June 7, 2022, https://perma.cc/RP7X-2669.

[4] The approval authority is the Major Command, Field Command, Direct Reporting Unit, or Field Operating Agency commander over the service member. Ex. 4 ¶ 4, App.73.

request, and addressing the standards. *Id.* ¶ 11.

The entire package is then submitted to the approval authority. *Id.* ¶¶ 11–12. The approval authority assesses each request individually to determine (1) if there is a sincerely held religious belief, (2) if the vaccination requirement substantially burdens the applicant's religious exercise based upon a sincerely held religious belief, and if so, (3) whether there is a compelling government interest in requiring that specific requestor to be vaccinated, and (4) whether there are less restrictive means in furthering that compelling government interest equally well. *Id.* ¶¶ 5, 13. If the approval authority denies the request, the service member may appeal to the Air Force Surgeon General, the highest-ranking medical professional in the Air Force, who reviews each package individually, is advised by another Religious Resolution Team, and renders a final decision on the request, taking into account these same four criteria. *Id.* ¶¶ 1, 4–5, 15. A member is temporarily exempt from the immunization requirement while their request is being adjudicated. *Id.* ¶¶ 14, 15; *see also* Ex. 8, Decl. of Col. Ethel M. Watson ¶ 7, App.98.

The Department of the Air Force has approved 86 religious exemption requests and 23 appeals. DAF COVID-19 Statistics – June 7, 2022, https://perma.cc/RP7X-2669.

B.   Refusal to Vaccinate

If an exemption request is ultimately disapproved and the service member refuses to take the COVID-19 vaccine, commanders may take a variety of administrative and disciplinary actions. Ex. 6, Decl. of Col. Elizabeth Hernandez ¶¶ 3–14, App.85–89. To ensure consistency and uniformity in disposition, a high-ranking official must review the case before any administrative or disciplinary action can be taken based on a COVID-19 vaccine refusal. *Id.* ¶ 3, App. 85.

Active duty service members who refuse to comply with the COVID-19 vaccination mandate, absent an exemption, will be subject to initiation of administrative discharge proceedings. *Id.* ¶ 10, App.87. The process begins when the service member's immediate commander notifies the service member of a recommendation for administrative discharge. *Id.* The service member may respond to

the discharge recommendation, with the help of free defense counsel, before that recommendation goes to the separation authority. *Id.* Commissioned officers who have completed six or more years of active commissioned service are generally entitled to a Board of Inquiry. *See* AFI 36-3206, Administrative Discharge Procedures for Commissioned Officers, Chapter 7, https://perma.cc/75UU-DDE5. A Board of Inquiry, made up of Department of the Air Force Officers, may recommend removal or discharge, among other things. *Id.* ¶¶ 7.31.1–7.31.4. If the recommendation is to retain the officer, the member is notified and the action ends. *See id.* ¶¶ 4.1–4.1.1, 4.2. Commissioned officers with less than six years of active commissioned service are entitled to present evidence to the appropriate show-cause authority. *Id.*, Ch. 4. The Air Force Personnel Board ("AFPB") reviews any discharge recommendations from a Board of Inquiry or show-cause authority. *Id.* Ch. 6. The AFPB may decide to retain the officer on its own initiative. *Id.* ¶¶ 6.5.1, 6.6.1, 6.9.1. But if the AFPB recommends removal or other adverse action, the officer may be removed only after a final decision by the Secretary of the Air Force or the Secretary's designee. *Id.* ¶¶ 6.10, 6.11.

The administrative discharge process generally takes at least several months and may result in the service member being retained. Ex. 6 ¶ 10, App.87–88. In addition, under the National Defense Authorization Act—and absent other misconduct—a service member who is discharged for refusing to receive the COVID-19 vaccine will receive either an Honorable Discharge or Under Honorable Conditions (General) Discharge. Pub. L. No. 117-81 § 736(a), 135 Stat. 1541, 1800 (2021).

Even if a service member is discharged at the conclusion of the administrative proceedings, further military remedies remain available to them. The member may, for instance, appeal the characterization of his discharge to the Air Force Discharge Review Board, which has the authority to review administrative discharges. Ex. 6 ¶ 16, App.89. That process takes six months to a year to complete. The member may also request correction of his military record through the Air Force Board for Correction of Military Records. That process takes three months to a year to complete. *Id.*, App.90.

The process differs for reservists. Traditional Reservists and Individual Mobilization

7

Augmentees who refuse to comply with the COVID-19 vaccination mandate, absent an exemption, will be placed in a no pay/no points status and involuntarily reassigned to the Individual Ready Reserve (IRR). *Id.* ¶ 11, App.88; Ex. 8 ¶ 7, App.98. Similarly, Active Guard and Reserve (AGR) members will have their AGR tour curtailed and be involuntary reassigned to the IRR. Ex. 6 ¶ 11, App.88. Reassignment to the IRR is not a discharge or separation. *Id.* Rather, reassignment to the IRR allows the Air Force Reserve to transfer a member with remaining military service obligation to the IRR, where they may complete their service obligation, rather than discharging the member out of the Air Force. Ex. 7, Decl. of Col. Ashley Heyen ¶ 4, App.93. Members reassigned to the IRR are eligible to return to a participating status should they meet readiness standards in the future. *Id.* ¶ 3, App.92. The reassignment process generally takes a few months. *Id.*

Here, two Plaintiffs have pending appeals, *see* Ex. 13, Decl. of Maj. Gen. Andrew J. Gebara ¶ 20 (Runyan), App.168; Ex. 14, Decl. of Col. Suanne M. Yoon ¶ 5 (Wu), App.171; one Plaintiff has a pending request for reconsideration of his religious accommodation request based on new information, *see* Ex. 20, Decl. of Lt. Col. Rimpa Patel ¶ 19 (Corcoran), App.847; and five other plaintiffs have had their appeals denied, *see* Ex. 22, Decl. of Col. Kyle H. Goldstein ¶ 14 (Grieb), App.933; Ex. 24, Col. Kyle H. Goldstein ¶ 13 (Haynes), App.1006; Ex. 26, Col. Kyle H. Goldstein ¶ 12 (Pike), App.1079; Ex. 29, Decl. of Col. Michael R. Stolley ¶ 8 (Sosebee), App.1149; Ex. 16, Decl. of Lt. Col. Garrett R. Chandler ¶ 6 (Stef), App.179; Ex. 18, Decl. of Col. Allen E. Duckworth ¶ 8 (Spence), App.278. Of those who have had their appeals denied:

- Stef received a Letter of Admonishment for attempting to circumvent the vaccination mandate with a fraudulent allergy claim, but has received no other discipline, and separation proceedings had not been initiated in part because he stated an intention to be vaccinated. *See* Ex. 16 ¶ 13, App.182–83.

- Haynes, Grieb, and Pike are reservists and would likely be subject to the initiation of involuntary reassignment to the Individual Ready Reserve, although that process has not been initiated. Grieb has received a Letter of Reprimand. *See* Ex. 20 ¶ 16–17, App.845–46; Ex. 24 ¶ 15–16, App1007; Ex. 26 ¶ 12, App.1079.

- Sosebee has received a Letter of Reprimand. *See* Ex. 29 ¶ 10–11, App.1150–51.

No Plaintiff has been discharged and separation proceedings have not been initiated.

## IV.    The Instant Action

In this action, Plaintiffs assert—on behalf of themselves and a yet-uncertified class—a violation of RFRA and of the Free Exercise Clause of the First Amendment. Compl. ¶¶ 136–74, Dkt. 1. They seek declaratory judgment and a temporary restraining order and preliminary injunction. *Id.* at 46–47. Plaintiffs' motion requests an injunction preventing Defendants from: (1) applying the COVID-19 vaccination requirement; (2) denying religious accommodation requests; and (3) taking "any adverse action against any servicemembers" on the basis of COVID-19 vaccination status or taking "retributive or negative action" for making a religious accommodation request. Mot. 2–3.

## V.    Other Litigation Over the Military's Vaccination Requirement

In addition to this case, numerous other challenges to the military's vaccination requirement have been brought in district courts across the country. Thirteen other courts have rejected similar arguments for preliminary injunctive relief against the military or dismissed the service members' claims entirely. *See Creaghan v. Austin*, No. 22-cv-0981 (CKK), 2022 WL 1500544 (D.D.C. May 12, 2022), *appeal filed*, No. 22-5135 (D.C. Cir. May 20, 2022); *Navy SEAL 1 v. Austin*, --- F. Supp. 3d ---, 2022 WL 1294486 (D.D.C. Apr. 29, 2022), *appeal filed*, No. 22-5114 (D.C. Cir. May 5, 2022); *Roberts v. Roth*, 21-cv-1797, 2022 WL 834148 (D.D.C. Mar. 21, 2022); *Roth v. Austin*, No. 8:22CV3038, 2022 WL 1568830 (D. Neb. May 18, 2022), *appeal filed*, No. 22-2058 (8th Cir. May 20, 2022); *Church v. Biden*, --- F. Supp. 3d ---, 2021 WL 5179215 (D.D.C. Nov. 8, 2021); *Thomas Short v. Berger*, No. 22-cv-00444, 2022 WL 1203876 (D. Ariz. Apr. 22, 2022), *appeal filed*, No. 22-15755 (9th Cir. May 18, 2022); *Vance v. Wormuth*, No. 3:21-cv-730-CRS, 2022 WL 1094665 (W.D. Ky. Apr. 12, 2022); *Mark Short v. Berger*, No. 22-cv-1151, 2022 WL 1051852 (C.D. Cal. Mar. 3, 2022); Ex. 31, *Dunn v. Austin*, No. 22-cv-00288 (E.D. Cal. Feb. 22, 2022) ("Dunn Op."); *Robert v. Austin*, 21-cv-02228, 2022 WL 103374 (D. Colo. Jan. 11, 2022); *Oklahoma v. Biden*, --- F. Supp. 3d ---, 2021 WL 6126230 (W.D. Okla. Dec. 28, 2021); *Guettlein v. U.S. Merch. Marine Acad.*, --- F. Supp. 3d ---, 2021 WL 6015192 (E.D.N.Y. Dec. 20, 2021); *Doe #1-#14*

*v. Austin*, --- F. Supp. 3d ---, 2021 WL 5816632 (N.D. Fla. Nov. 12, 2021). Moreover, in *Dunn*, where the district court denied the service member's preliminary injunction motion, the Supreme Court recently denied the member's application for an injunction pending appeal. *Dunn*, 142 S. Ct. 1707.

Five courts have preliminary enjoined DoD and the respective Service from applying COVID-19 vaccination requirements or taking adverse action against plaintiffs in those cases. *See Navy SEALs 1–26 v. Biden*, --- F. Supp. 3d ---, 2022 WL 34443 (N.D. Tex. Jan. 3, 2022), *denying stay pending appeal* 27 F.4th 336 (5th Cir. Feb. 28, 2022), *granting stay sub nom., Austin v. Navy SEALs 1-26*, 142 S. Ct. 1301 (2022); *Navy SEAL 1 v. Biden*, 8:21-cv2429, 2022 WL 483832 (M.D. Fla. Feb. 2, 2022); *Air Force Officer v. Austin*, --- F. Supp. 3d ---, 2022 WL 468799 (M.D. Ga. Feb. 15, 2022); *Poffenbarger v. Kendall*, --- F. Supp. 3d ---, 2022 WL 594810 (S.D. Ohio Feb. 28, 2022), *appeal filed*, No. 22-3413 (6th Cir. May 3, 2022; *Doster v. Kendall*, --- F. Supp. 3d ---, 2022 WL 982299 (S.D. Ohio Mar. 31, 2022). The government strongly disagrees with those decisions and to date has filed a notice of appeal in each one. In *Navy SEALs 1-26*, the Supreme Court granted the government's application for a partial stay of the district court's injunction. *Navy SEALs 1–26*, 142 S. Ct. 1301.[5] Similarly, in *Navy SEAL 1*, the Eleventh Circuit stayed the district court's injunction pending appeal "insofar as it precludes the Navy from considering the plaintiffs' vaccination status in making deployment, assignment, and other operational decisions." No. 22-10645 (11th Cir. Mar. 30, 2022).

## LEGAL STANDARDS

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *Anderson v. Jackson*, 556 F.3d 351, 360 (5th Cir. 2009). Plaintiffs must "*by a clear showing*" establish that (1) they have a substantial likelihood of success on the merits; (2) they will suffer irreparable harm without an injunction; (3) the balance of equities tips in their favor; and (4) preliminary relief serves the public interest. *Mazurek v. Armstrong*, 520 U.S. 968,

---

[5] The district court in *Navy SEALs 1-26* subsequently entered a class-wide preliminary injunction against the Navy, which the Government has also appealed. 2022 WL 1025144, at *9 (N.D. Tex. Mar. 28, 2022), appeal filed No. 22-10534 (5th Cir. May 27, 2022).The district court in *Navy SEAL 1* also subsequently entered injunctive relief on behalf of an additional individual, and the time for appealing that decision has not yet run.

972 (1997). Plaintiffs' failure to demonstrate any one of the four factors is sufficient to deny injunctive relief, *Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 809 (5th Cir. 1989), and "[t]he decision to grant a preliminary injunction is to be treated as the exception rather than the rule[,]" *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985).

Additionally, courts extend great deference to the military when called to review the "complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force," which are "essentially professional military judgments." *Winter*, 555 U.S. at 24 (quoting *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973)); *Farmer v. Mabus*, 940 F.2d 921, 923 (5th Cir. 1991) ("We are keenly aware that judicial intrusion into military matters is to be most cautiously and charily approached."). As the Supreme Court has repeatedly emphasized, "it is difficult to conceive of an area of governmental activity in which the courts have less competence." *Gilligan*, 413 U.S. at 10; *see also Schlesinger v. Ballard*, 419 U.S. 498, 510 (1975) ("[I]t is the primary business of armies and navies to fight or be ready to fight wars should the occasion arise[, and] [t]he responsibility for determining how best our Armed Forces shall attend to that business rests with Congress [] and with the President."); *Rostker v. Goldberg*, 453 U.S. 57, 66 (1981) (noting that because of the "healthy deference to legislative and executive judgments in the area of military affairs," courts employ a relaxed scrutiny in reviewing military policy); *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986). Such deference extends to constitutional claims and military decisions about the health and welfare of the troops, *see Solorio v. United States*, 483 U.S. 435, 448 (1987); *Mazares v. Dep't of Navy*, 302 F.3d 1382, 1385 (Fed. Cir. 2002), and in the RFRA context, *see e.g.*, *Thomas Short*, 2022 WL 1203876, at *13; *Mark Short*, 2022 WL 1051852, at *7–8; Ex. 31, *Dunn* Op. at 36, 46–48, App.1222, 1232–34.

## ARGUMENT

I.    **Plaintiffs Are Unlikely to Succeed on the Merits of Their Claims.**

A.    **Plaintiffs' Claims Are Not Ripe.**

Plaintiffs' claims are not ripe. "The ripeness doctrine's basic rationale is to prevent the courts,

through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *TOTAL Gas & Power N. Am., Inc. v. Fed. Energy Regulatory Comm'n*, 859 F.3d 325, 333 (5th Cir. 2017). Ripeness "protects the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 434 (5th Cir. 2021) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967)); *see also Hodges v. Callaway*, 499 F.2d 417, 423 (5th Cir. 1974) (explaining importance of allowing military to finalize its own decisions); *Von Hoffburg v. Alexander*, 615 F.2d 633, 637–38 (5th Cir. 1980) (same). "If [a] purported injury is 'contingent on future events that may not occur as anticipated, or indeed may not occur at all,' the claim is not ripe for adjudication." *Lopez v. City of Houston*, 617 F.3d 336, 342 (5th Cir. 2010) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580–81 (1985)).

"To determine whether claims are ripe, [courts] evaluate (1) the fitness of the issues for judicial resolution, and (2) the potential hardship to the parties caused by declining court consideration." *Id.* at 341. Both prongs must be satisfied. "Unsuitability for review is determinative." *Huawei Techs.*, 2 F.4th at 435 n.30. Similarly, a court need not "address the fitness of the issues for judicial decision" where a plaintiff "has not satisfied the hardship prong of the ripeness inquiry." *Choice Inc. of Texas v. Greenstein*, 691 F.3d 710, 718 (5th Cir. 2012). Generally, "a case is not ripe if further factual development is required." *Monk v. Huston*, 340 F.3d 279, 282 (5th Cir. 2003) (citation omitted). Plaintiffs' claims fail to satisfy either prong.

Plaintiffs' claims are not fit for judicial resolution for several reasons. First, "matters 'still pending before [an agency] . . . [are] not yet ripe for judicial review.'" *Shrimpers & Fisherman of the RGV v. U.S. Army Corps of Eng'rs*, 849 F. App'x 459, 462 (5th Cir. 2021) (quoting *La. Power & Light Co. v. Fed. Power Comm'n*, 526 F.2d 898, 910 (5th Cir. 1976)). Two Plaintiffs—Runyan and Wu—have not yet even received final decisions on their religious accommodation requests, and a third—Corcoran—has a request for reconsideration pending. Addressing these Plaintiffs' claims before their religious accommodation requests are finally adjudicated "would require the Court to adjudicate internal

military affairs before the military chain of command has had a full opportunity to consider the accommodation requests at issue." *Church*, 2021 WL 5179215, at *11. The Air Force must have the opportunity to articulate a compelling interest in vaccinating a particular Plaintiff and to decide whether or not less restrictive means exist for each individual. The individualized records for those Plaintiffs do not yet exist, and until those decisions and records are made, it is not possible for this Court to assess whether the Air Force has met its burden. As noted, the Air Force has granted at least 109 exemptions to date, including 23 on appeal. Accordingly, this Court should allow Runyan and Wu to receive a final decision on appeal, and should allow Corcoran to receive a decision on his request for reconsideration.

Second, for the six other Plaintiffs whose religious accommodation requests have been denied on appeal, "further factual development would 'significantly advance [the Court's] ability to deal with the legal issues presented.'" *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 812 (2003) (citation omitted). The denial of a religious accommodation request—standing alone—does not ripen a controversy. Rather, it is the imposition of *consequences* that result from failing to receive the COVID-19 vaccine that ripen a controversy. And it is yet unclear what those consequences may be: the Air Force has not even initiated, much less concluded, any disciplinary or separation actions against any of these Plaintiffs, and imposing and finalizing any such consequences takes a minimum of several months. *See supra* pp. 6–8. Accordingly, Plaintiffs' claims remain "riddled with contingencies and speculation that impede judicial review." *Church*, 2021 WL 5179215, at *8 (citation omitted). As one court explained in a similar case, the fact that Plaintiffs "ha[ve] not been discharged at this point . . . means that [P]laintiff[s'] alleged injur[ies] [are] theoretical, rather than certain and pending." *Roberts*, 2022 WL 834148, at *4 (dismissing case even when—in contrast to the instant action— discharge proceedings had been initiated, because they had not concluded).[6]

Defendants acknowledge that this Court previously rejected, in *U.S. Navy SEAL 1–26 v. Biden*,

---

[6] *See also, e.g., Vance*, 2022 WL 1094665, at *7; *Standage v. Braithwaite*, 526 F. Supp. 3d 56, 94 (D. Md. 2021); *Diraffael v. Ca. Mil. Dep't*, No. 10-cv-7240, 2011 WL 13274364, at *3 (C.D. Cal. Mar. 21, 2011).

an argument that Navy service members' claims were unripe in a similar context. *See* Order on Motion to Dismiss, *Navy SEALs 1–26*, Case 4:21-cv-01236-O, Dkt. 150, at 4–5 (N.D. Tex. May 7, 2022) (denying Motion to Dismiss). The Government respectfully disagrees with that decision and reserves its position on this issue. But the Court's prior ruling is also distinguishable in at least two respects: First, it was premised in part on the Court's impression that, at that time, the Navy had granted zero religious accommodation requests, and the result was therefore "predetermined." *See id.* Here, in contrast, the Air Force has granted at least 109 religious accommodation requests, and the number has steadily increased, *see* DAF COVID-19 Statistics—June 7, 2022, https://perma.cc/RP7X-2669, as the Air Force works through a historic surge in religious accommodation requests, *see* Ex. 11, Decl. of Maj. Gen. Sharon R. Bannister ¶ 24, App.137. Like the Navy, the Air Force's review of every request is individualized. *Id.* ¶ 4, App.129 (confirming that "[t]here is no blanket policy or practice of disapproving all religious accommodation requests" and that "[e]ach request is reviewed individually—by both the initial approval level decision authority and the appellate authority"); *see generally* Ex. 4 ¶ 5, App.73–74; *see also infra* Part I.E. Moreover, in the *Navy Seals* case, the Court relied upon specific Navy policies that the Court believed imposed immediate ongoing consequences on those seeking religious accommodations. *See Navy SEALs 1–26*, Case 4:21-cv-01236-O, Dkt. 150, at 4–5. Plaintiffs here point to no similar policies. In any event, the Court did not specifically consider the constitutional ripeness doctrine as it related to the justiciability of relief regarding separation and discipline. Thus, even if claims about policies imposing immediate adverse consequences could be ripe, claims about hypothetical future separation proceedings are not ripe and the Court lacks jurisdiction to enjoin the challenged future actions.

The mere existence of an Air Force policy that vaccine refusal *may* result in discharge or separation is insufficient. The Air Force's separation proceedings are comparable to the permissive regulations at issue in *Toilet Goods Association v. Gardner*, 387 U.S. 158 (1967). There, the Supreme Court held that a challenge to a regulation was unripe for review when the regulation was permissive rather

than mandatory—*i.e.*, it did not compel the agency to act but only authorized the agency to exercise a discretionary power to act. Similarly, the regulations here provide that "[i]n the case of a refusal to comply with the COVID-19 vaccination mandate, absent an exemption, regular service members will be subject to initiation of administrative discharge proceedings." Ex. 6 ¶ 10, App.87. The Air Force's "initiation of separation proceedings is a tentative action not fit for judicial review; one can only speculate as to the final outcome of any proceedings." *Smith v. Harvey*, 541 F. Supp. 2d 8, 13 (D.D.C. 2008); *see also Roberts*, 2022 WL 834148, at *5 (similar); *Vance*, 2022 WL 1094665, at *3, 7 (similar). And as discussed below, even should the Air Force initiate separation proceedings, Plaintiffs still have substantial administrative remedies. *See infra* Part I.B.

Plaintiffs also fail to establish hardship from delay. As discussed *infra* in Section II, Plaintiffs will suffer no irreparable harm between now and when the Air Force decides whether to pursue administrative action against them, and what the outcome of such action might be.

### B. Plaintiffs' Claims are Not Justiciable Because They Failed to Exhaust Their Administrative Remedies.

This Circuit decides the justiciability of claims requiring review of "internal military affairs" using the test articulated in *Mindes v. Seaman*, 453 F.2d 197 (5th Cir. 1971); *Meister v. Tex. Adjutant General's Dep't*, 233 F.3d 332, 339 (5th Cir. 2000). In *Mindes*, the Fifth Circuit held that courts "should not review internal military affairs in the absence of (a) an allegation of the deprivation of a constitutional right, or an allegation that the military has acted in violation of applicable statutes or its own regulations, and (b) exhaustion of available intraservice corrective measures." 453 F.2d at 201. If a plaintiff satisfies both of those two prerequisites, courts must weigh four factors, discussed in Part I.C, to determine if the case is reviewable.

Similar to the ripeness analysis, Plaintiffs' claims should be dismissed as nonjusticiable for failure to exhaust their intra-military remedies. *See Von Hoffburg*, 615 F.2d at 637–38; *Hodges*, 499 F.2d at 419–20; *Mindes*, 453 F.2d at 201. In *Hodges v. Callaway*, for example, the Fifth Circuit concluded that although the plaintiff seemed unlikely to prevail in challenging his discharge, he was still required to

exhaust his military remedies, and the court ordered dismissal of the action because "courts must—at least initially—indulge the optimistic presumption that the military will afford its members the protections vouchsafed by the Constitution, by the statutes, and by its own regulations." 499 F.2d at 424. To do otherwise "might upset the balance between the civilian judiciary and the military" and involve "untoward, unreasonable interference with the efficient operation of the military's judicial and administrative systems" when the Court should "allow the military an opportunity to exercise its own expertise and rectify its own errors before a court is called to render judgment." *Id.* at 423. Neither the exemption process nor the separation process reasonably can be deemed an "empty formality"; all levels of military command are engaged in reasoned decision-making to find facts and make determinations about military needs. The Court should not foreclose that ongoing process.

Defendants recognize that this Court found that Navy servicemembers should be excused from the exhaustion requirement. *Navy SEALs 1-26*, 2022 WL 34443, at *5–8; *see also Navy Seals 1-26*, 2022 WL 1025144 (Mar. 28, 2022) (class-wide injunction). Again, Defendants respectfully disagree, reserve their position on exhaustion, and maintain that this case is distinguishable for much the same reasons set forth above. The process is not pre-determined, and Plaintiffs do not face any imminent irreparable harm. *See infra* Part II. Nor is any evidence that the separation process or the Board of Correction for Military Records are pre-determined or futile remedies. The Court should not preemptively enjoin internal military decisions that have not yet been finally adjudicated before the military has the opportunity to correct any errors.

### C. Plaintiffs' Assignment Claims Are Not Justiciable.

Plaintiffs' motion explicitly asks the court to interfere in military assignment decisions. For example, it asks the Court to enjoin actions based on vaccination status to include: a "change in job titles or duties, removal from assignments, or non-issuance of assignments;" "determination of medical disqualification or non-deployability;" "loss or delay of promotion [or] training opportunities," and "precluding servicemembers from traveling to and performing duty in person."

16

Mot. 3–4. Plaintiffs, in other words, wish the Court to oversee their duties, assignments, ranks, fitness determinations, and a multitude of other assignment-related decisions in the day-to-day running of the Air Force—contrary to the Supreme Court's stay in *Navy SEALs 1-26*. Even if Plaintiffs had all exhausted their intra-military remedies or were subject to some exception, any claims seeking injunctive relief regarding their specific duty assignments are not justiciable under *Mindes*. This Court weighs four factors to determine whether review of internal military matters is appropriate: (1) the nature and strength of the plaintiff's challenge, (2) his potential injury if review is refused, (3) the type and degree of anticipated interference with the military function, and (4) the extent to which the exercise of military expertise or discretion is involved. *See Mindes*, 453 F.2d at 201-02. All four factors demonstrate that Plaintiffs cannot obtain civilian review of their duty assignments. This second step of the *Mindes* analysis "requires the court to balance the sufficiency of the complaint's allegations against the policies contravening review." *Johnson v. Reed*, 609 F.2d 784, 788–89 (5th Cir. 1980).

The Supreme Court and multiple Circuits have confirmed that courts may not review challenges to such assignment decisions, even when they involve a constitutional challenge. *See, e.g., Orloff v. Willoughby*, 345 U.S. 83, 94–95 (1953); *Harkness v. Sec'y of Navy*, 858 F.3d 437, 444–45 (6th Cir. 2017); *Cargill v. Marsh*, 902 F.2d 1006, 1007 (D.C. Cir. 1990) ) (per curiam); *Schlanger v. United States*, 586 F.2d 667, 671 (9th Cir. 1978); *Sebra v. Neville*, 801 F.2d 1135, 1141 (9th Cir. 1986); *Wilson v. Walker*, 777 F.2d 427, 429 (8th Cir. 1985); *Cortright v. Resor*, 447 F.2d 245, 254 (2d Cir. 1971); *Antonellis v. United States*, 723 F.3d 1328, 1332 (Fed. Cir. 2013). The Supreme Court order in the *Navy Seals* case shows that injunctive relief of this nature is not appropriate. Recognizing that this Court previously found that the matter of Navy service members' assignments presented in the Navy case was a "purely legal question" appropriate for review under *Mindes*, *see Navy SEALs 1-26*, 2022 WL 34443, at *7–8; *Navy SEALs 1-26,* 2022 WL 1025144, at *9–11, the Supreme Court's stay of that portion of the order powerfully supports the conclusion that such relief is improper. As the Supreme Court order confirms, whether, when, and how to assign and deploy and promote service members, and what COVID-19

17

mitigation measures must apply to them, is not a purely legal question, but rather, the quintessential exercise of military judgment. As Justice Kavanaugh explained in concurring with the stay order, "the Court has long emphasized" that "the 'complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments.'" *Navy Seals 1–26*, 142 S. Ct. at 1302 (Kavanaugh, J., concurring) (quoting *Gilligan*, 413 U.S. at 10). "[E]ven accepting that RFRA applies in this particular military context," "RFRA does not justify judicial intrusion into military affairs in this case." *Id.* For the foregoing reasons, the Court should not seek to exercise jurisdiction over assignment, deployability, and other operational decisions.

### D.  Plaintiffs Lack Venue in this District, and Are Improperly Joined.

Plaintiffs have pleaded venue for only two of the nine Plaintiffs: Bryan Spence and Tyler Stef. Compl. ¶¶ 11–12. The remaining seven Plaintiffs do not reside in the Northern District of Texas, do not work in the Northern District of Texas, and their claims are based on events that occurred outside the Northern District of Texas. Compl. ¶¶ 13–19. The claims of these seven Plaintiffs should be severed as improperly joined and either dismissed for lack of venue under Rule 12(b)(3) or transferred to the proper venue pursuant to 28 U.S.C. § 1406. *See, e.g.*, *Crosby v. Austin*, No. 8:21-cv-02730 (M.D. Fla. Feb. 22, 2022), Dkt. 44 (severing claims in suit brought by fifteen service members where "[o]nly one of the Plaintiffs ha[d] anything to do with the Middle District of Florida").

### E.  Plaintiffs Are Unlikely to Succeed on the Merits of Their RFRA Claims.

Military orders to vaccinate do not violate RFRA if the government "demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b). Requiring Plaintiffs to be vaccinated furthers the compelling interests in military readiness and health and safety of service members and is the least restrictive means of advancing those interests. "[A] majority of the Supreme Court has already held . . . that the Government is likely to succeed on the merits on the same claims brought by Navy SEALs," and although this decision

may not be formally binding, "it is the most persuasive authority on which a District Court may rely." *Navy SEAL 1*, 2022 WL 1294486, at *4.

### 1. Vaccinating Plaintiffs Against COVID-19 Furthers the Government's Compelling Interests.

Requiring Plaintiffs to be vaccinated against COVID-19 furthers the compelling military interests in force health and readiness, especially when evaluated against the backdrop of substantial deference that courts have always given to military operational decisionmaking. The Supreme Court has held that "[s]temming the spread of COVID–19 is unquestionably a compelling interest." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020). This interest is especially compelling in the military context, because "when evaluating whether military needs justify a particular restriction on religiously motivated conduct, courts must give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest." *Mark Short*, 2022 WL 1051852, at *7 (quoting *Goldman*, 475 U.S. at 507); *see also Orloff*, 345 U.S. at 94 ("Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate [military] matters as the [military] must be scrupulous not to intervene in judicial matters."); *Bryant v. Gates*, 532 F.3d 888, 899 (D.C. Cir. 2008) ("[I]nterfere[nce] with the military's pursuit of its critical mission and involve[ment of] the courts in military decisions . . . are well beyond the competence of judges.") (Kavanaugh, J., concurring). The Supreme Court has repeatedly emphasized that the government's interest in "maximum efficiency" of military operations is paramount, *cf. United States v. O'Brien*, 391 U.S. 367, 381 (1968), and that "[f]ew interests can be more compelling than a nation's need to ensure its own security," *Wayte v. United States*, 470 U.S. 598, 611 (1985). Congress expressly recognized these long-standing principles of military deference in enacting RFRA. *See* S. Rep. No. 103-111, 12 (1993) ("The courts have always recognized the compelling nature of the military's interest in [good order, discipline, and security] in the regulations of our armed services [and] have always extended to military authorities significant deference in effectuating these interests. The committee intends and expects that such deference will continue under this bill."); H.R. Rep. No. 103-88, at 8 (1993).

After consulting with "medical experts and military leadership," including the "Chairman of the Joint Chiefs of Staff, the Secretaries of the Military Departments, [and] the Service Chiefs," the Secretary of Defense "determined that mandatory vaccination against [COVID-19] is necessary to protect the Force and defend the American people." Sec'y of Def. Mem. (Aug. 24, 2021), https://perma.cc/N759-S758; Sec'y of Def. Mem. (Aug. 9, 2021), https://perma.cc/S4R3-2VZW. The Secretary of the Air Force likewise found that COVID-19 vaccination of each service member is necessary to ensure military readiness and the health and safety of airmen. Sec'y of Air Force Mem. at 1 (Sept. 3, 2021), https://perma.cc/6E2W-3EQM; *see also* Ex. 12, Decl. of Lt. Gen. Kevin B. Schneider ¶ 6, App.142–43. And "logic alone" dictates that "the military's general compelling interest in ensuring the health of its servicemembers . . . distill[s] to a compelling interest in ensuring that [each individual service member] remains healthy enough to accomplish her duties." *Creaghan*, 2022 WL 1500544, at *9; *see also Roth*, 2022 WL 1568830, at *17. The Court must "give great deference" to the "professional military judgments" of these leaders when it comes to what is needed to ensure military readiness and the welfare of service members. *Winter*, 555 U.S. at 24–25 (quoting *Goldman*, 475 U.S. at 507; *Gilligan*, 413 U.S. at 10). And "when executive officials 'undertake to act in areas fraught with medical and scientific uncertainties' their judgments 'should not be subject to second-guessing by an unelected federal judiciary, which lacks the background, competence, and expertise to assess public health.'" *Mark Short*, 2022 WL 1051852, at *5 (quoting *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613–14 (2020) (Roberts, C.J., concurring)); *see also Creaghan*, 2022 WL 1500544, at *8 ("[T]he military's technical, *scientific* findings supporting the wisdom of a particular, generally applicable military order may be due some regard greater than those resting on no such findings.").

Here, the Air Force conducted an individualized, "to the person" analysis that RFRA requires, 42 U.S.C. § 2000bb-1(b), considering each of these Plaintiff's particular job duties and concluding that allowing each of them to remain unvaccinated would undermine the Air Force's compelling interest in ensuring they can carry out their military duties effectively. *See, e.g., Roth*, 2022 WL 1568830, at *15

("Defendants made individualized determinations of the harm to the Air Force's compelling interests in readiness and health and safety of service members, including the individual applicants, of granting specific exemptions to particular religious claimants.").

Plaintiffs Grieb and Haynes perform the same duties as instructor pilots in the 340th Flying Training Group. Ex. 22 ¶¶ 1, 3–4, App.928–29; Ex. 24 ¶¶ 1, 3–4, App.1001–02. The Air Force Surgeon General denied Grieb's appeal because his assignment requires "time in and around the confined spaces of aircraft" and "frequent contact with others" such that it "would significantly impact training accomplishment if [Grieb, [his] trainees, or [his] fellow instructors were exposed or actively infected." Ex. 23, Grieb RAR at 49, App.985. The Air Force Surgeon General denied Haynes' appeal on similar grounds. Ex. 25, Haynes RAR at 50, App.1059. Grieb's and Haynes' roles as instructor pilots require significant in-person, close-proximity interaction with trainees and other instructors. Ex. 22 ¶ 4, App.929; Ex. 24 ¶ 4, App.1002. Should either of them become infected, their resulting quarantine— and possible hospitalization—could result in training delays and impact the ultimate availability of pilots to perform flying operational missions. Ex. 22 ¶¶ 4–5, App.929–30; Ex. 24 ¶¶ 4–5, App.1002. Both of them must also remain deployable. Ex. 22 ¶ 7, App.930–31; Ex. 24 ¶ 7, App.1003–04; *see infra* pp. 25 (discussing importance of vaccination for deployability).

Pike is a pilot trainee in the same 340th Flying Training Group. Ex. 26 ¶¶ 1, 3, App.1074–75. He will begin as a F-16 pilot with the 301st Fighter Wing following completion of his training. Ex. 27, Decl. of Col. Allen E. Duckworth ¶ 3, App.1082. Accordingly, the Decision Authority denied his request, Ex. 28, Pike RAR at 37, App.1124, and the Air Force Surgeon General denied his appeal for similar reasons, noting that his "training status requires time in and around the confined spaces of aircraft as well as frequent contact with others," and COVID-19 infection "would significantly impact training accomplishment," *id.* at 11, App.1098; *see also* Ex. 26 ¶¶ 5–6, App.1075–76; Ex. 27 ¶ 5, App.1083. Pike also must remain deployable. Ex. 26 ¶¶ 9, App.1077–78; Ex. 27 ¶ 6, App.1083.

Similarly, Stef is an instructor pilot trainee in the 90th Flying Training Squadron. Ex. 16 ¶¶ 1,

3, App.177–78. The Decision Authority denied his request due to his close contact with other service members, including "instructors and students, while undergoing training." Ex. 17, Stef RAR at 21, App.207; *see also* Ex. 16 ¶ 4, App.178 (explaining Stef's interaction with others in aircrafts, during pre- and post-flight briefings, and during other instruction). The Air Force Surgeon General denied his appeal based on his status as an instructor pilot trainee, the health risks, and the potential for harming the squadron's ability to effectively train pilots. Ex. 17 at 70, App.256; *see also* Ex. 16 ¶ 5, App.178–79.

Spence, as an instructor pilot in the 301st Fight Wing, implicates the same compelling interests as do the other Plaintiff pilot instructors and trainees. Ex. 18 ¶¶ 1, 5–8, App.275–78. Accordingly, the Air Force Surgeon General denied Spence's appeal due to his "instructor role," the time he spends "in and around the confined spaces of aircraft," and his "prolonged contact with multiple individuals." Ex. 19, Spence RAR at 95, App.376.

Sosebee also has comparable duties as the Chief of Group Training and a glider instructor pilot in the 306th Flying Training Group, as well as a Supervisor of Flying for air traffic control. Ex. 29 ¶¶ 1, 3–4, App.1146–48. Sosebee provides group training guidance for five squadrons, comprised of over 900 service member and civilian personnel. *Id.* ¶ 3, App.1147. He works in an open office that has daily direct involvement and interactions with multiple personnel across multiple organizations. *Id.* He must also remain ready to deploy. *Id.* As a Supervisor of Flying, he sits in the air traffic control tower—a confined space manned by the Supervisor of Flying and five controllers. *Id.* ¶ 4, App.1147–48. The Decision Authority denied Sosebee's request because his "leadership and instructor role" requires "close contact with students and other personnel." Ex. 30, Sosebee RAR at 63, App.1215. The Air Force Surgeon General denied his appeal due to his "frequent contact with others" and his "leadership role," noting that "institutionalizing remote completion of [his] duties permanently would be detrimental to readiness, good order and discipline, and unit cohesion." *Id.* at 12, App.1164.

Corcoran is an intelligence officer. Ex. 20 ¶¶ 1, 4, App.840–42. The Decision Authority denied his request because his "duties require [him] to access classified materials within a Sensitive

Compartmentalized Information Facility (SCIF) on a daily basis," which is a "close-quarters, poorly ventilated environment," and he is "in direct, regular contact" with other service members. Ex. 21, Corcoran RAR at 57, App.906; *see also* Ex. 20 ¶ 6–7, App.842–43. The Air Force Surgeon General agreed. *Id.* at 64. Reconsideration is pending, however, based on information originally not available to the Air Force Surgeon General. Ex. 20 ¶ 18–19, App.846–47 (explaining that Corcoran has now satisfied all requirements to complete a twentieth "good year" towards retirement, and a religious accommodation would allow him to reach December 20, 2022, which would make him eligible to retire on January 1, 2023).

The remaining two Plaintiffs—Runyan and Wu—still have pending appeals and thus their records are not complete. They do not have decisions from the Air Force Surgeon General, nor the endorsements upon which the Surgeon General relies. Nevertheless, the record indicates that the Air Force has a compelling interest in requiring them to be vaccinated. Runyan is a Staff Judge Advocate providing legal advice for the Eighth Air Force, which employs "strategic bombers, worldwide, on a continuous and indefinite-duration basis, in order to deter aggression by our Nation's strategic competitors." Ex. ___ ¶ 6, App.XX. In that capacity, she handles sensitive information and conducts in-person communication with other staff in order to keep up with the complex, high-tempo military operations that they advise upon. *Id.* ¶ 14–15. Wu, similarly, is the Deputy Chief—and former Staff Judge Advocate—for the 43d Air Mobility Operations Group. Ex. 14 ¶ 3, App.171. While the decision authorities initially denied each of these requests, the appeals are still pending.

These professional military judgments are amply supported by evidence showing COVID-19's harmful impact on the military and military readiness. COVID-19 has "impacted all elements of DoD simultaneously," including exercises, deployments, redeployments, and other global force management activities, Ex. 1 ¶¶ 4, 6–8, App.3–5; caused the cancellation of numerous significant preparedness and readiness events, *id.* ¶ 9, App.5–6; suspended operations and resulted in inoperability of aircraft carriers for months in strategically significant areas, *id.* ¶ 8, App.5; and infected hundreds of thousands

of service members, hospitalized thousands, and tragically caused the loss of 96 service members, *id.* ¶ 3, App.3; *see also* Ex. 12 ¶ 26, App.153; Ex. 22 ¶ 4, App.929. In the Department of the Air Force alone, over 100,000 service members have been infected, resulting in significant lost days of time and readiness. DAF COVID-19 Statistics – June 7, 2022, https://perma.cc/RP7X-2669. These harms have real effects on mission efficiency.

The Department's professional military judgments are also supported by the positive effects that COVID-19 vaccination has had on force readiness and health. Vaccinations have reduced the risk of infections, hospitalizations, and deaths of service members. *See, e.g.*, Ex. 1 ¶¶ 16–18, App.7–9; Ex. 2 ¶ 8, 11–12, App.22–25; Ex. 10, Decl. of Lt. Col. Paul Y. Kim ¶ 9, App.109–10; *see also Church*, 2021 WL 5179215, at *18 (requiring vaccination is "supported by a lengthy record replete with data demonstrating the necessity of a general vaccine mandate"); *Mark Short*, 2022 WL 1051852, at *7 (noting "the empirical evidence in the record of the vaccine's efficacy" and the military's "evidence-based approach in its reliance on vaccination"); *Oklahoma*, 2021 WL 6126230, at *14 (stressing that the vaccine "has been shown to be remarkably effective in mitigating the effects of the pandemic which has affected . . . thousands of service members"). Vaccination also reduces the severity of COVID-19 for those who do contract infection, including the chances of death and hospitalization: For instance, the overwhelming percentage of the service members who have died from COVID-19 were unvaccinated. Ex. 1 ¶ 3, App.3; Ex. 2 ¶ 12, App.25. Likewise, "[b]etween July and November of 2021, non-fully-vaccinated active-duty service members had a 14.6-fold increased risk of being hospitalized when compared to fully vaccinated active-duty service members," and "[i]n December 2021 unvaccinated adults were 16-times more likely to be hospitalized than vaccinated adults." Ex. 1 ¶ 18, App.XX; *see also* Ex. 10 ¶ 9, App.109–10. A recent study published by the CDC confirmed mRNA vaccine effectiveness against invasive mechanical ventilation or death during the Omicron-predominant period, CDC, Morbidity and Mortality Weekly Report (Mar. 18, 2022), https://perma.cc/HJH3-PEN4; *see also* Ex. 10 ¶ 9, App.109–10. Vaccinations also reduced the number

of service members required to quarantine, permitted the military to return to higher levels of occupancy in DoD facilities and hold in-person training, and allowed service members to participate in joint training exercises with countries that have vaccination requirements. Ex. 1 ¶ 14, App.7. In short, "[g]iven the tangible protection the vaccines afford service members against infection, serious illness, hospitalization, and death, it is clear that COVID-19 vaccines improve readiness and preserve the DoD's ability to accomplish its mission." Ex. 1 ¶ 20, App.10.

Vaccination also furthers the military's interest in having service members ready to "deploy on a few days' notice." *See, e.g.,* Ex. 22 ¶ 7, App.930–31; Ex. 10 ¶ 6, App.108. Service members must "stay deployment-ready in the event that not only they get individually tasked with a deployment, but in the event the entire [unit] gets activated due to current world events." Ex. 22 ¶ 7, App.930–31. The vaccine is necessary for members to stay deployment-ready because a member's illness or an outbreak in a deployed environment "create an unacceptable risk to personnel and substantially increase the risk of mission failure." *Id.* Deployed environments frequently do not have extensive medical facilities, such that a critically ill service member may not receive the same level of care they would receive in the United States and caring for that ill member may take away the unit's medical capacity to treat battle injuries. *Id.* Moreover, because deployments are "by design, minimally manned," "[i]f one service member were to get sick, contract long-COVID, get hospitalized, or die, that section may only have one extra person performing similar duties, leaving little redundancy and backup to support the mission." *Id.* "An outbreak impacting multiple service members could potentially risk support to the mission altogether." *Id.*

None of Plaintiffs' arguments against the military's compelling interest are availing.[7] Plaintiffs

---

[7] Plaintiffs' arguments generally "confuse the Air Force's 'compelling interest' with whether the Air Force's chosen means furthers that 'compelling interest.'" *See Roth*, 2022 WL 1568830, at *18. Yet nothing "in *Burwell*, *Holt*, or other controlling authority indicat[es] that the 'compelling interest' at issue in RFRA is the 'means' the Government chose." *Id.* The Air Force's compelling interest is preventing COVID-19 from impairing the readiness and health of its forces; the Air Force's chosen means undoubtedly further that interest, as discussed. Plaintiffs' arguments to the contrary are misdirected. Those arguments "are relevant instead to the question of whether the Defendants can demonstrate

cannot rely on medical and administrative exemptions to undermine the government's compelling interest in vaccinating Plaintiffs. These exemptions are not comparable to religious accommodations. *Cf. Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) ("Comparability is concerned with the risks various activities pose"). In contrast to religious accommodations, medical exemptions serve the interest in military readiness: vaccinating a service member who has medical contraindications to the vaccine would harm the member's health, *detracting* from the military's interests in ensuring readiness and the health and safety of members. Ex. 3 ¶¶ 12–13, 15, 19, App.65–66, 68.[8] Likewise, administrative exemptions for members who are leaving the military are appropriate because requiring vaccination of individuals who will no longer be part of the force does not further the military's interest in ensuring readiness. Ex. 5 ¶ 3, App.81–82; Ex. 9, Decl. of Lt. Col. Justin L. Long ¶ 5, App.102. Administrative exemptions are granted only to service members on terminal leave, separating, or retiring from the Air Force.[9, 10] Ex. 9 ¶¶ 4–5, App.102; Ex. 5 ¶ 3, App.81–82. Moreover, all medical and administrative exemptions are temporary—in contrast to the presumptive permanence of a religious belief opposing COVID-19 vaccination. Ex. 3 ¶¶ 13–14, App.65–66; Ex. 5 ¶¶ 3–4, App.81–82; Ex. 9 ¶ 5, App.102; *see also Mark Short*, 2022 WL 1051852, at *5 ("Only *permanent* medical exemptions are analogous to religious exemptions, because a religious belief is not likely to be temporary[.]"). Both medical and administrative exemptions have been steadily declining for months because medical exemptions

---

that the COVID-19 vaccination mandate 'is the least restrictive means of furthering [the Air Force's] compelling interest.'" *Id.* (quoting 42 U.S.C. § 2000bb-1(b)(2)) (alteration in original). Regardless, Defendants address Plaintiffs' arguments in the context that Plaintiffs raise them.

[8] *See also Navy SEAL*, 2022 WL 1294486, at *12; *Mark Short*, 2022 WL 1051852, at *8; *Doe v. San Diego Unified Sch. Dist.*, 19 F.4th 1173, 1178 (9th Cir. 2021), *cert. and application for injunction denied*, 142 S. Ct. 1099 (2022); *Does 1–6 v. Mills*, 16 F.4th 20, 31 (1st Cir. 2021), *cert. denied, Does 1-3 v. Mills*, 142 S. Ct. 1112 (2022).

[9] Administrative exemptions are also authorized for service members who are actively participating in COVID-19 vaccine clinical trials in the interest of furthering the efficacy of the vaccine itself. *But see* Ex. 3 ¶ 23, App.70 ("I am not personally aware of anyone that currently has an exemption from the COVID-19 vaccine because they are participating in a vaccine clinical trial.").

[10] This effectuates the stated intent of Congress. *See* Joint Explanatory Statement to FY 2022 NDAA at 151, https://perma.cc/FL8K-PFUU ("We also expect the Department to include . . . exemptions [from mandatory COVID-19 vaccination] for servicemembers nearing separation and retirement in the development of uniform procedures relating to administrative exemptions.").

require the service member to be vaccinated when their condition is resolved, *see* Ex. 3 ¶ 14, App.66, and administrative exemptions end when the recipient leaves the service, *see* Ex. 9 ¶ 5, App.102; Ex. 5 ¶ 3, App.81–82.[11] Accordingly, the rate of overall medical and administrative exemptions will continue to decline over time.

Nor do medical and administrative exemptions allow the recipient to continue in their job duties as if they were vaccinated, as Plaintiffs here seek to do. Rather, "contrary to Plaintiffs' contentions, service members with medical, administrative, or religious exemptions to the COVID-19 vaccination mandate do not operate within the Air Force as if they were vaccinated." *Roth*, 2022 WL 1568830, at *20. All unvaccinated service members are subject to the deployment, assignment, and duty restrictions and limitations that Plaintiffs seek to avoid. Ex. 3 ¶ 16, App.66. Medical exemptions render a service member non-deployable and subject to additional restrictions, *id.* ¶¶ 15–17, and service members who remain non-deployable for more than 12 consecutive months are reevaluated for retention in service, DoDI 1332.45 ¶ 1.2(b), https://perma.cc/9FNU-ZR89. Thus, medical and administrative exemptions are not comparable to religious accommodations and do not undermine the military's compelling interest in vaccinating Plaintiffs.

Two Plaintiffs—Pike and Stef—allege that they were treated differently based on whether they had a medical exemption or a pending religious accommodation request. Pls.' Mem., at 11, Dkt. 5 ("Mem."). But their difference in treatment comes down to the difference between a *granted* exemption and a *pending* exemption. Nineteenth Air Force policy, which applies to both Pike and Stef, places an administrative hold on service members enrolled in formal training courses who are unvaccinated but actively seeking an exemption—regardless of what type of exemption that is. *See* Memo. re: COVID-19 Vaccination Status and Formal Training (Aug. 31, 2021), https://perma.cc/RB7U-DFQC. Thus,

---

[11] *Compare* DAF COVID-19 Statistics - January 2022, https://perma.cc/BJ9D-7AJ4, *with* DAF COVID-19 Statistics – June 7, 2022, https://perma.cc/RP7X-2669. There are currently only 25 Active Duty and 89 Reservists with administrative exemptions; and 337 Active Duty and 172 Reservists with medical exemptions. DAF COVID-19 Statistics – June 7, 2022, https://perma.cc/RP7X-2669. Comparatively, the Air Force has granted 109 total religious accommodation requests. *Id.*

Pike and Stef were not treated differently "depending on whether a medical or a religious accommodation [wa]s at issue." Mem. 11. Rather, they were allowed to attend training when they had granted medical exemptions, and then—once their medical exemptions were revoked—they were placed on administrative hold because they had only pending exemptions.

Plaintiffs also assert that they are "aware of unvaccinated individuals with their same duties . . . who have not faced adverse action, simply because their accommodation requests were medical, rather than religious." Mem. 11. Plaintiffs provide no authority for this statement. Preliminarily, these alleged "unvaccinated individuals" are anonymous non-parties to this litigation who have not signed anything under penalty of perjury; nor is it obvious why Plaintiffs would know the full details about these individuals' exemption statuses. More importantly, all of Plaintiffs' proffered stories comport with Air Force policy that unvaccinated service members are treated the same, regardless of the reason for their vaccination status. For example, Grieb alleges that he knows one anonymous service member with a medical exemption for allergies who "is not allowed to conduct any TDY travel." App. to Mot., Dkt. 6 at 111 ¶ 31. This is in line with DoD policy that an unvaccinated service member—even with an approved exemption, whether religious, medical, or administrative— is subject to travel limitations. Ex. 22 ¶ 5, App.929–30. Grieb also alleges that he knows one anonymous service member whose medical exemption expired in March, but he has not yet been ordered to vaccine and is allowed to conduct TDY travel because he "believes he has fallen through the cracks." App. to Mot., Dkt. 6 at 111–12 ¶ 32. Absent any details to confirm this case, this allegation at most shows that the Air Force may have made a technical error, but fails to show that those with medical exemptions are treated differently than those with religious accommodations. Indeed, this anonymous service member allegedly explicitly has avoided "highlight[ing]" this error so the Air Force does not discover the mistake. *Id.* Similarly, Haynes alleges that he knows two anonymous service members with medical exemptions who were allowed to travel on "essential" business. *Id.* at 100 ¶ 32 (describing one trip to Poland "with the Presidential Advance Team," which "is responsible for

coordinating with the Secret Service in preparation for Air Force One movements supporting the President's travel"). Again, absent details to confirm this allegation, it may comport with the Department of the Air Force's policy that unvaccinated service members—regardless of the reason for their vaccination status—may travel only when such travel is deemed "mission critical." *See, e.g.*, Ex. 22 ¶ 5, App.929–30. Plaintiffs' final piece of alleged evidence comes from Spence, who alleges only that he has "personal, first-hand knowledge that some of those individuals [with the same job duties as him] have been granted medical exemptions and can perform their job duties." App. to Mot., Dkt. 6 at 47 ¶ 33. Plaintiff Spence provides no further details regarding this allegation, including the particular jobs at issue or any ongoing restrictions. Accordingly, none of Plaintiffs' allegations can be accepted to show that the Air Force treats unvaccinated service members differently based on their exemption type.

Plaintiffs are also incorrect that the overall rate of vaccination in the Air Force eliminates the Air Force's compelling interest in having Plaintiffs vaccinated as well. Mem. 12. Even the risk of a single individual going unvaccinated is serious because unvaccinated individuals have many times the risk of testing positive for COVID-19. Ex. 1 ¶¶ 16–18, App.7–9; Ex. 10 ¶ 9, App.109–10. Plaintiffs' refusal to immunize against COVID-19 also increases the rate of transmission to others within the Air Force, and there is a "realistic possibility" of any one of them infecting other service members with COVID-19 who would not otherwise become infected. *United States v. Christie*, 825 F.3d 1048, 1057 (9th Cir. 2016) (upholding convictions against RFRA challenge); *see also* Ex. 10 ¶¶ 4, 9, App.106–07, 109–10; *Roth*, 2022 WL 1568830, at *27 ("[T]he 'everyone else did it so I don't have to' argument fails . . . . because the trustworthy scientific evidence in the record so far establishes that COVID-19 vaccinations reduce the chances of hospitalization and death of individual service members and the impact those events have on the force's and individuals' readiness and health.").

Additionally, given the many thousands of religious objections, the potential harm to the Air Force is much greater. *See* Ex. 12 ¶ 6, App.142–43; *see also Mark Short*, 2022 WL 1051852, at *5

("Though Plaintiff is just one person, the cumulative effect of accommodating all similar requests could require integrating over [7,000] additional unvaccinated servicemembers."). Nearly 9,000 airmen have submitted religious accommodation requests. DAF COVID-19 Statistics – June 7, 2022, https://perma.cc/RP7X-2669. Under Plaintiffs' approach, without an individualized review for these individuals, the Air Force would be forced to allow thousands of unvaccinated service members to serve, risking the spread of disease, hospitalizations, and death within multiple units for both unvaccinated personnel, as well as vaccinated personnel at risk of breakthrough infections. *See* Ex. 10 ¶ 4, App.106–07; Ex. 12 ¶ 28, App.154–55. And to the extent Plaintiffs claim that the Air Force has achieved some form of "herd immunity," Mem. 13, they are mistaken. Service members live in and interact with individuals in communities surrounding military bases, which only increases the risk of contracting the disease and spreading it to other members. Ex. 10 ¶ 26, App.120 (providing community vaccination rates for each of Plaintiffs' counties). In any event, herd immunity simply is not as effective as vaccination at protecting a member from infection, spreading the disease, or combatting the disease. *Id.* ¶¶ 26–27, App.119–21; Ex. 2 ¶ 25, App.35. Unvaccinated service members are at an increased risk of infection and may spread the virus (particularly new variants) to other service members, and thus still pose a risk of significant harm to maintaining a healthy force. Ex. 10 ¶¶ 29, App.122; Ex. 2 ¶ 27, App.36–37. For these reasons, the military has not set any benchmark to cease any of its immunization requirements based on herd immunity. *See* Ex. 2 ¶¶ 23–27, App.34–37. The military has instead determined that maximum vaccination for all of the mandatory ten vaccines minimizes the risk to service members of illness and outbreaks. *See id.* The Court should defer to the military's assessment of the acceptable level of risk. *See Gilligan*, 413 U.S. at 10.

Plaintiffs also argue that the military's compelling interest in vaccination is lessened because they "waited over seven months before issuing their mandate." Mem. 13. But, as noted, the Secretary of Defense issued the vaccination directive on August 24, 2021—one day after the FDA announced approval of the first COVID-19 vaccine. *See* Sec'y of Def. Mem. (Aug. 24, 2021),

https://perma.cc/N759-S758; FDA, *News Release – FDA Approves First COVID-19 Vaccine* (Aug. 23, 2021), https://perma.cc/C4DD-PWE5; *see also* Sec'y of Def. Mem. (Aug. 9, 2021), https://perma.cc/S4R3-2VZW (promising to seek presidential approval for mandatory vaccination "no later than mid-September [2021], or immediately upon [FDA] licensure, whichever comes first"). The Air Force cannot be faulted for waiting until FDA approval to mandate vaccination.

Plaintiffs' contention that some of them have recovered from COVID-19 and therefore have "natural immunity," Mem. 13, is similarly unpersuasive. While a prior infection can provide some protection against another infection for some amount of time, the available medical evidence leaves much unknown about the strength, consistency and duration of that protection. Ex. 10 ¶¶ 22–23, App.115–18; Ex. 2 ¶¶ 20–22, 30, App.32–34, 39–40; Ex. 31, *Dunn* Op. at 39–40, App.1225–26 ("[I]t's not well established that a natural immunity is effective, more effective or as effective as the vaccine."). Contrary to Plaintiffs' declarations of immunity, there is no scientific consensus on the amount of antibodies that would indicate protection from reinfection, or for how long or to what degree such protection would exist. Ex. 10 ¶¶ 22–23, App.115–18; Ex. 2 ¶¶ 20–22, 30, App.32–34, 39–40; *see also* FDA, *Antibody Testing Is Not Currently Recommended to Assess Immunity After COVID-19 Vaccination: FDA Safety Communication* (May 19, 2021), https://perma.cc/X8GQ-TNHQ ("Be aware that a positive result from an antibody test does not mean you have a specific amount of immunity or protection from SARS-CoV-2 infection."); FDA, *Antibody (Serology) Testing for COVID-19: Information for Patients and Consumers* (Feb. 24, 2022), https://perma.cc/WY9T-6LSG ("Antibody tests do not tell you whether or not you can infect other people with SARS-CoV-2."). And evidence shows that protection from a prior infection increases following vaccination. Ex. 2 ¶ 21, App.33; Ex. 10 ¶ 23, App.117; *see also Bauer v. Summey*, --- F. Supp. 3d ---, 2021 WL 4900922, at *12 (D.S.C. Oct. 21, 2021) (citing "evidence that vaccines provide more robust protection than antibodies from a previous COVID-19 infection"). The Air Force has therefore determined, consistent with guidance from the CDC, that vaccination is the best way to minimize the risk posed by COVID-19 to military readiness. Ex. 10 ¶ 23, App.118; *see also*

DoDI 6205.02 ¶ 1.2, https://perma.cc/8HLA-AXQB (mandating vaccination in accordance with the CDC's recommendations); CDC, *Interim Clinical Considerations for Use of COVID-19 Vaccines Currently Approved or Authorized in the United States* (last updated Apr. 21, 2022), https://perma.cc/3646-DC3S (recommending COVID-19 vaccination for individuals five and over "regardless of a history of symptomatic or asymptomatic [COVID-19] infection," and "serologic testing to assess for prior infection is not recommended for the purpose of vaccine decision-making"); *cf. Biden v. Missouri*, 142 S. Ct. 647, 653–54 (2022) (concluding that it was rational for an agency to rely on CDC guidance in requiring vaccination even for individuals with "natural immunity" from prior COVID-19 illness); *Norris v. Stanley*, 1:21-cv-756, 2022 WL 557306, at *4 (W.D. Mich. Feb. 22, 2022) (similar), *appeal filed*, No. 22-1200 (6th Cir. Mar. 14, 2022); *Valdez v. Grisham*, 559 F. Supp. 3d 1161, 1177 (D.N.M. 2021)(similar), *appeal filed*, No. 21-2105 (10th Cir. Sept. 15, 2021).

Plaintiffs also mistakenly imply that the Air Force's compelling interest in ensuring the health of its service members has lessened over time. Mem. 13–14. "To the contrary, continued vaccination remains essential to protecting against serious illness, hospitalization, and death; is key to limiting the opportunities for the virus to mutate (thus causing new variants); and is necessary in reducing public risks that could require future safety measures such as travel restrictions and reinstituting public health measures." Ex. 2 ¶ 44, App.45. The country as a whole still has only a 66.7% vaccination rate. *Id.* Indeed, on April 12, 2022, the Secretary of Health and Human Services renewed the determination that a public health emergency still exists. *Id.* ¶ 45, App.57. Thus, any suggestion that vaccination is less important merely because the world has loosened certain COVID-19 restrictions ignores the reality that that COVID-19 remains an extraordinary significant, current public health risk.

Accordingly, the Air Force correctly determined that vaccinating these nine Plaintiffs furthers the Air Force's compelling interest in military readiness.

### 2. Vaccination is the Least Restrictive Means of Furthering the Government's Compelling Interest in Military Readiness.

As other courts have found in non-military settings, a uniform practice of vaccination is the

least restrictive means for accomplishing the government's interest in preventing the spread of infectious diseases in the workforce. *See, e.g.*, *Does 1–6*, 16 F.4th 20 (health-care workers); *Doe*, 19 F.4th 1173 (students); *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266 (2d Cir. 2021) (health-care workers), *application for injunction denied*, *Dr. A. v. Hochul*, 142 S. Ct. 552 (2021); *see also Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 733 (2014) (recognizing that vaccines "may be supported by" the government's compelling interest in "the need to combat the spread of infectious diseases"). This reasoning has even greater force in the military setting, where health of service members is paramount to military readiness, and where the acceptable level of risk to the mission must be a military, not judicial, judgment. *See Navy SEALs 1–26*, 142 S. Ct. at 1302 (Kavanaugh, J., concurring) (cautioning that a court may not "insert[] itself into the [military's] chain of command, overriding military commanders' professional military judgments"); *Mark Short*, 2022 WL 1051852, at *7 (emphasizing deference to military judgments and adding that "[t]his deference is layered on top of the deference that courts must give to expert policymakers on matters involving complex medical or scientific uncertainties"); Ex. 31, *Dunn* Op. at 37–42, App.1223–28 (finding vaccination of an Air Force officer to be the least restrictive means, including because of the necessary deference afforded to military assessments and because "judges aren't scientists").

After careful consideration of Plaintiffs' respective requests for a religious accommodation and their appeals, the Air Force Surgeon General—the most senior medical professional in the Department—concluded that no lesser restrictive means sufficiently serve the Air compelling interests in readiness and ensuring the health and safety of all service members equally well. The Air Force is not required to use an alternative that does not serve its compelling interests "equally well" relative to vaccination. *See Burwell*, 573 U.S. at 731 (examining whether alternative served stated interest "equally well"); *Kaemmerling v. Lappin*, 553 F.3d 669, 684–85 (D.C. Cir. 2008) (rejecting RFRA and constitutional challenges against DNA Act, where "[a]ny alternative method of identification would be less effective" in accomplishing the government's compelling interests).

For instance, the Department considered whether telework or remote work could provide a less restrictive alternative, but concluded that none of the Plaintiffs can complete their duties remotely. For example, Griebs, Haynes, and Sosebee—as instructor pilots—cannot conduct training remotely given the hands-on instruction required. *See* Ex. 11 ¶ 21, App.136; Ex. 22 ¶¶ 4–5, App.929–30; Ex. 24 ¶¶ 4–5, App.1002–03; Ex. 29 ¶¶ 3–5, App.1147–48; *see also* Ex. 26 ¶ 5 (pilot instructee), App.1075; Ex.29 ¶ 4–5, App.1002–03 (air traffic control). Those who must access classified or sensitive information, including Corcoran, cannot do so from their residences. *See, e.g.,* Ex. 20 ¶ 10, App.844; Ex. 13 ¶ 15, App.166.

The mere fact that some Plaintiffs have conducted some of their duties via telework thus far does not suffice to show that telework is a lesser restrictive means than vaccination. As another district court recently emphasized:

> [M]erely because the military has found ways to perform its duties despite the risks of COVID-19 does not mean it must endure these risks indefinitely when there are effective means of mitigating them. Like many millions of other essential workers, the military has heroically and with great ingenuity found ways to persevere during an unprecedented deadly pandemic. But that does not mean that the military is not entitled to use the most effective means available to end its crisis footing and return to a semblance of normalcy.

*Mark Short*, 2022 WL 1051852, at *9; Ex. 31, *Dunn* Opp. at 37, App.1223 ("[I]t does come down . . . to what level of risk is appropriate. If the military can eliminate almost all risk through this policy, then there is a compelling governmental interest."); Ex. 30 at 63, App.1215 ("For the past 18 months, the Air Education and Training Command fought through the COVID pandemic by implementing several extreme measures . . . . Continuing to implement these drastic measures detracts from the readiness, efficiency, good order and discipline of the force, and is unsustainable as the long-term solution.").

Likewise, the Air Force evaluated the feasibility and effectiveness of masking and distancing but concluded that those measures are not as effective as vaccination. For example, masking and social distancing is not possible as a pilot or air traffic controller due to safety and communication concerns.

*See, e.g.*, Ex. 22 ¶ 9, App.932; Ex. 24 ¶ 9, App.1005; Ex. 29 ¶ 4, App.1147–48; Ex. 16 ¶ 9, App.180. Unlike vaccination, masking and distancing do not provide any protection to an infected individual from severe illness or death. Ex. 10 ¶¶ 11–14, 24–25, App.110–12, 118–19; *see also Roth*, 2022 WL 1568830, at *23 ("It should be obvious that masks and social distancing provide no protection to a service member who is infected with COVID-19, but COVID-19 vaccination does."). Unlike vaccination, the effectiveness of masking and distancing fluctuates based on human behavior. Ex. 10 ¶¶ 11–14, 24–25, App.110–12, 118–19. And masking distancing ignores the fact that the named Plaintiffs share workspaces and that aspects of their work require close contact with other individuals. *See United States v. Elder*, 18-cr-92, 2022 WL 836923, at *9 (E.D.N.Y. Mar. 21, 2022) ("While admirable and necessary, these protocols have their limits. By themselves, face masks, social distancing, and similar measures may be effective for small groups over short periods of time, but fail to ensure the safety of large groups in close contact for sustained periods.").

Plaintiffs propose that the Department rely on "periodically testing" in lieu of vaccination. Mem. 15. But although "[s]erial testing will curtail the exposure in the unit after the infection is detected," it "is not as effective as preventing the original infection." Ex. 10 ¶ 19, App.114. The military experienced multiple COVID-19 outbreaks when it merely required service members to undergo routine testing requirements, rather than requiring vaccination. Ex. 1 ¶¶ 7–8, App.4–5; *see Does 1-6*, 16 F.4th at 33 (noting same was true of Maine). Nor do testing and temperature checks prevent a service member who tests positive from suffering serious health outcomes, such as long COVID, hospitalization, and death. Ex. 10 ¶ 20, App.114–15. Moreover, the "virus can be easily transmitted to others prior to symptom development and therefore may infect significant numbers before being identified." Ex. 2 ¶ 10, App.21; Ex. 10 ¶¶ 18–19, App.114.

In sum, the military is best situated to assess whether a specific unvaccinated individual puts the military mission at risk and whether feasible, less restrictive alternatives are available. The Air Force has made that considered judgment here, , and its judgment is reasonable and supported by the record.

RFRA does not compel the Air Force to adopt a measure that is inferior in the military context to requiring the use of safe and effective vaccines. Nor does RFRA require the Department to elevate Plaintiffs' desires and contrary view above its professional judgments of the acceptable amount of risk to its mission. Therefore, Plaintiffs have not shown a likelihood of success on their RFRA claims so to warrant the extraordinary preliminary injunctive relief they seek.

### F.  Plaintiffs' First Amendment Claims Are Unlikely to Succeed on the Merits.

Plaintiffs' claim under the First Amendment also fails.[12] "[R]eview of military regulations challenged on First Amendment grounds is far more deferential than constitutional review of similar laws or regulations designed for civilian society." *Goldman*, 475 U.S. at 507; *id.* at 510 (rejecting a service member's Free Exercise Clause claim because the Air Force "reasonably and evenhandedly regulate[s] dress in the interest of the military's perceived need for uniformity"); *cf. Trump v. Hawaii*, 138 S. Ct. 2392, 2420 n.5 (2018) (noting, in rejecting, Establishment Clause claim, that the respondents there "cite no authority for [their] proposition that the more free-ranging inquiry [they] propose[] is appropriate in the national security . . . context").

Even assuming the military context was not relevant, strict scrutiny would still be inapplicable under a constitutional analysis because the vaccine requirement is neutral and generally applicable. *See Kaemmerling*, 553 F.3d at 677. It applies to *all* Air Force members; its "terms . . . do not make any reference to religion," Ex. 31, *Dunn* Op. at 44, App.1230; and it was expressly implemented in order to ensure "a healthy and ready force"—not to suppress religious belief, Sec'y of Def. Mem. (Aug. 24, 2021), https://perma.cc/N759-S758; Ex. 12 ¶¶ 5–8, 14–18, 25, App.142–43, 147–49, 153; *see also* Ex. 31, *Dunn* Op. at 43–44, App.1229–30 (finding Air Force's vaccine requirement generally applicable and subject to rational basis review); *Trump*, 138 S. Ct. at 2420 ("On the few occasions where" the

---

[12] There is no need for the Court to address the First Amendment claim separately. If the Government prevails on the RFRA claim, then the Government would necessarily prevail under the First Amendment claim because RFRA and the Free Exercise Clause involve the same compelling interest and least restrictive means standard of review. Conversely, if Plaintiffs prevail under RFRA, the Court could grant relief without considering Plaintiff's First Amendment claim and thus avoid unnecessarily confronting a constitutional question.

Supreme Court has struck down a law under rational basis scrutiny, "a common thread has been that the laws at issue lack any purpose other than a 'bare . . . desire to harm a politically unpopular group.'") (citation omitted); *We The Patriots*, 17 F.4th at 281 (concluding that New York's vaccine requirement for healthcare workers was facially neutral "because it does not single out employees who decline vaccination on religious grounds" and it "applies to all personnel"); *Doe*, 19 F.4th at 1177 (similar, regarding school district's student vaccination requirement). Plaintiffs cannot demonstrate that the Department's vaccine requirement "lack[s] any purpose other than a bare desire to harm" any set of religious beliefs so as to trigger a higher level of scrutiny. *Trump*, 138 S. Ct. at 2420 (cleaned up).

Contrary to Plaintiffs' assertion, *see* Mem. 17, the Air Force's allowance of certain exemptions does not trigger strict scrutiny. Plaintiffs' citation to *Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021), is unavailing. *Fulton* arose in the civilian context, which does not implicate the longstanding principle that "review of military regulations challenged on First Amendment grounds is far more deferential than constitutional review of similar laws or regulations designed for civilian society." *Goldman*, 475 U.S. at 507; *see also Trump*, 138 S. Ct. at 2420 n.5. Indeed, "'when it comes to collecting evidence and drawing inferences' on questions of national security, 'the lack of competence on the part of the courts is marked.'" *Id.* at 2419. "'Any rule of constitutional law that would inhibit the flexibility' of the President 'to respond to changing world conditions should be adopted only with the greatest caution,' and [judicial] inquiry into matters of . . . national security is highly constrained." *Id.* at 2419–20 (citation omitted).

Additionally, *Fulton* held that "'[a] law is not generally applicable if it 'invite[s]' the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized exemptions.'" *Fulton*, 141 S. Ct. at 1877 (quoting *Emp. Div., Dep't of Health & Hum. Res. of Or. v. Smith*, 494 U.S. 872, 884 (1990)). By contrast, "an exemption is not individualized simply because it contain[s] express exceptions for objectively defined categories of persons." *303 Creative LLC v. Elenis*, 6 F.4th 1160, 1187 (10th Cir. 2021) (citation omitted), *cert. granted in part*, 142 S. Ct. 1106 (2022); *see also Kane v.*

*De Blasio*, 19 F.4th 152, 165 (2d Cir. 2021); *Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 276 (3d Cir. 2007). Thus, it is "not the mere existence of an exemption procedure" that triggers strict scrutiny, but rather the existence of a generalized, discretionary exemption procedure that allows the government to determine that the mere "religious *motivation* of [a requestor's] conduct[] justified the unavailability of an exemption." *Lighthouse Inst. for Evangelism, Inc.*, 510 F.3d at 276. In order to trigger strict scrutiny, "there must be some showing that the exemption procedures allow secularly motivated conduct to be favored over religiously motivated conduct." *Kane*, 19 F.4th at 165. Thus, the open-ended "'good cause' standard" in *Fulton* triggered strict scrutiny because it "'invit[ed]' the government to decide which reasons for not complying with the policy are worthy of solicitude." 141 S. Ct. at 1877, 1879.

In contrast, here, Plaintiffs make no showing that the religious accommodation procedures vest Air Force decisionmakers with unrestricted discretion to favor secularly motivated conduct over religiously motivated conduct. As explained above, the exceptions for medical exemptions and administrative exemptions are not comparable to religious accommodations and are provided in "*objectively* defined" circumstances. *We The Patriots*, 17 F.4th at 289 (emphasis added) (finding vaccine mandate for healthcare facilities generally applicable, even where it allowed for medical exemptions, because such exemptions applied to "an objectively defined category of people," *i.e.*, those with a medical certification of a preexisting health condition); *see also Kane*, 19 F.4th at 166 (similar); *Doe*, 19 F.4th at 1180 (similar). The Air Force's medical exemptions provide for those same sorts of objectively defined circumstances. Ex. 3 ¶ 6, App.62. In fact, vaccinating a service member "who is known or expected to be injured by the vaccine would harm her health." *We The Patriots*, 17 F.4th at 285. Maintaining the health of the force is the very interest served by the military's vaccination program. A religious exemption does not serve that interest. *See Does 1–6*, 16 F.4th at 31 ("[P]roviding healthcare workers with medically contraindicated vaccines would threaten the health of those workers and thus compromise both their own health and their ability to provide care."). Likewise, the Air Force approves

38

administrative exemptions for "an objectively defined category of people," *i.e.*, those who are on terminal leave or imminently retiring or separating from service. *See* Ex. 5 ¶¶ 3–4, App.81–82; Ex. 9 ¶ 5, App.102. Those exemptions, too, do not undercut the Air Force's compelling interests in the way that permitting religious objectors to continue serving unvaccinated and unrestricted would.[13] And the medical and administrative exemptions that Plaintiffs criticize are not comparable to religious exemptions requests because the latter significantly eclipse the former, causing far greater risk and harm to the military's interests. *See Mark Short*, 2022 WL 1051852, at *8 ("[E]vidence of a small number of medical exemptions relative to a much larger amount of religious exemption requests 'suggests that the medical exemption is not as harmful to the legitimate government interests purportedly justifying the Rule as a religious exemption would be.'") (quoting *We The Patriots*, 17 F.4th at 286); Ex. 31, *Dunn* Op. at 44, App.1230 ("The fact that the Air Force has granted medical and administrative exemptions does not render the mandate not generally applicable" because "these exemptions do not undermine the government's interests the way a religious exemption would[.]"); *We The Patriots*, 17 F.4th at 286; *Doe*, 19 F.4th at 1178; Ex. 3 ¶¶ 12–13, App.65 (*no* permanent medical exemptions granted by the Air Force); Ex. 5 ¶¶ 3–4, App.81–82 (same regarding administrative exemptions); Ex. 9 ¶ 5, App.102 (same regarding other administrative exemptions).

In any event, as noted, *see supra* note 12, even if strict scrutiny applied, the vaccine mandate would survive because, as explained in the RFRA analysis above, it is justified by a compelling governmental interest and is narrowly tailored to fulfill that interest. *Cuomo*, 141 S. Ct. at 67; *Doe*, 19 F.4th at 1177.

## II.   Plaintiffs Do Not Face Irreparable Harm.

Plaintiffs must show that, in the absence of an injunction, they are "likely to suffer irreparable harm." *Daniels Health Scis., LLC v. Vascular Health Scis., LLC*, 710 F.3d 579, 585 (5th Cir. 2013) (citation omitted). It is not enough simply to "show[] some possibility of irreparable injury." *Nken v. Holder*,

---

[13] Moreover, the policy permitting administrative exemptions under certain conditions for service members retiring or separating was implemented for service members who receive a denial of their medical, religious, or administrative exemption. Ex. 9 ¶ 4, App.102.

556 U.S. 418, 434–35 (2009); *see also Winter*, 555 U.S. at 22 (explaining that issuing a preliminary injunction "based only on a possibility of irreparable harm" would be "inconsistent" with treating a preliminary injunction as an "extraordinary remedy"). "Speculative injury is not sufficient" to "make a clear showing of irreparable harm." *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985). Moreover, "the irreparable harm element must be satisfied by independent proof, or no injunction may issue." *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989).

"In general, a harm is irreparable where there is no adequate remedy at law, such as monetary damages." *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011). Conversely, "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974). And "[i]n the context of 'military personnel decisions, . . . courts have held that the showing of irreparable harm must be *especially strong* before an injunction is warranted, given the national security interests weighing against judicial intervention in military affairs." *Church*, 2021 WL 5179215, at *17 (citation omitted). Plaintiffs make no such showing.

Plaintiffs first argue that they have and will continue to suffer administrative punishment, loss of promotion, separation, and other employment-related harms. Mem. 19–20. But such employment-related harms do not constitute irreparable injury absent a "genuinely extraordinary situation." *Sampson*, 415 U.S. at 92 n.68; *see Air Force Officer*, 2022 WL 468799, at *12 ("While it is true that Plaintiff has 'gradually [been] stripped of her duties, benefits, and pay, and forced into early retirement' . . . these harms are redressable as monetary damages and therefore insufficient to obtain injunctive relief." (citation omitted)). And courts have consistently found that military administrative and disciplinary actions, including separation and a less than honorable discharge, are not irreparable injuries because the service member could later be reinstated and provided back pay if he prevailed on his claim. *See, e.g.*, *McCurdy v. Zuckert*, 359 F.2d 491, 493 (5th Cir. 1966) (finding that separation from service with "a general discharge" is not "irreparable"); *Hartikka v. United States*, 754 F.2d 1516, 1518 (9th Cir. 1985);

*Chilcott v. Orr*, 747 F.2d 29, 34 (1st Cir. 1984); *Guitard v. Sec'y of Navy*, 967 F.2d 737, 742 (2d Cir. 1992); *Church*, 2021 WL 5179215, at *17 (finding that adverse action such as "military discharge or a delayed promotion" that service members may face as a result of non-compliance with the DoD COVID-19 vaccine directive "is not irreparable") (citing *Bois v. Marsh*, 801 F.2d 462, 468 (D.C. Cir. 1986)); *Thomas Short*, 2022 WL 1203876, at *7–8.

Plaintiffs also argue that they are irreparable harmed vis-à-vis the alleged harm to their statutory and constitutional rights. But as discussed, Plaintiffs fail to establish likelihood of success on the merits, so infringement is neither "threatened [nor] occurring." *Elrod v. Burns*, 427 U.S. 347, 374 (1976); *see, e.g.*, *Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 334 (D.C. Cir. 2018) (explaining that to show irreparable harm based on loss of constitutional rights, movant must "show a likelihood of success on the merits"), *cert. denied*, 140 S. Ct. 1198 (2020); *Bellinger v. Bowser*, 288 F. Supp. 3d 71, 88–89 (D.D.C 2017) (denying preliminary injunction, "even assuming that every [constitutional] allegation constitutes an irreparable injury," where the other factors "weigh so heavily against Plaintiffs that they cannot prevail"); *Mark Short*, 2022 WL 1051852, at *9 ("[B]ecause this Court has found that Plaintiff failed to demonstrate a sufficient likelihood of success on the merits of his religious freedom claims, there is no presumption of irreparable harm."); Ex. 31, *Dunn* Op. at 45, App.1231; *Thomas Short*, 2022 WL 1203876, at *7–8; *Creaghan*, 2022 WL 1500544, at *10 ("A mere 'possibility of irreparable harm' is not enough[.]").

Even assuming Plaintiffs can show likely success on the merits of their First Amendment claim—which they cannot—there is no broad excision of the irreparable harm requirement any time a plaintiff asserts a colorable constitutional claim. *Cf. Navy SEAL 1*, 2022 WL 1294486, at *16 ("A likelihood of success on Plaintiff's RFRA claim will not do, however, as RFRA provides only a statutory right."). This case is much different than cases where "the plaintiffs were literally prevented from exercising their religion in group settings." *Doe*, 19 F.4th at 1181. For example, in *Tandon v. Newsom*, the Supreme Court held that closing places of worship is irreparable because it prevented

individuals from group worship. 141 S. Ct. at 1297. That holding echoed the conclusion of at least five Justices in *South Bay United Pentecostal Church v. Newsom* that "California's prohibition on singing and chanting during indoor services" could constitute irreparable harm. 141 S. Ct. 716, 717 (2021) (Barrett, J., concurring).

Here, in contrast, Plaintiffs "may exercise [their] religion by declining to receive the vaccination." *Id.*; *see also Navy SEAL 1*, 2022 WL 1294486, at *16 (concluding that "no government actor is preventing" service members in this situation "from exercising [their] alleged religious conviction against COVID-19 vaccination" because service members "remain[] free to depart the military" in lieu of vaccination and to worship as they desire); *Thomas Short*, 2022 WL 1203876, at *8 ("Because Major Short may continue to 'exercise [his] religion by declining to receive the vaccination,' [applying *Doe*], he has not suffered an irreparable injury under Ninth Circuit law." (citation omitted)).

## III.   The Equities and the Public Interest Weigh Against a Preliminary Injunction.

The third and fourth requirements for issuance of a preliminary injunction—the balance of harms and whether the requested injunction will disserve the public interest—"merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. These factors tilt decisively against granting a preliminary injunction here—both for the nine Plaintiffs and on a nationwide, Air Force–wide basis.

The public has an exceptionally strong interest in national defense, *see Winter*, 555 U.S. at 24–26 (vacating preliminary injunction where the balance of equities and public interest, with deference to military judgments, "tip strongly in favor of the Navy"), and, for all of the reasons explained above, the military has a compelling interest in requiring its forces to be vaccinated, healthy, and ready to accomplish any and every military mission, *see North Dakota v. United States*, 495 U.S. 423, 443 (1990); *Mark Short*, 2022 WL 1051852, at *5 (explaining that deciding the potential harm to the national defense "necessarily involves 'complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force[, which] are essentially professional military judgments'" (quoting *Gilligan*, 413 U.S. at 10)).

An injunction allowing Plaintiffs to continue serving in their preferred assignments—including in deployable positions—without being vaccinated against COVID-19 would not only threaten harm to Plaintiffs and the service members working alongside them, but would also compromise their units' collective abilities to execute their military and intelligence duties, maintain their necessary readiness, and accomplish their missions. *See* Ex. 12 ¶ 8, App.143 (explaining that a nationwide injunction would "creat[e] significant and irreparable harm to good order and discipline, force health protection, and military readiness," which would "seriously danger[] the Department of the Air Force's ability to decisively execute its mission"); *Qualls v. Rumsfeld*, 357 F. Supp. 2d 274, 286 (D.D.C. 2005) ("In evaluating the harm to the [military], the court must consider the aggregate harm of all these possible claims."); *Bors v. Allen*, 607 F. Supp. 2d 204, 212 (D.D.C. 2009) (similar); *Parrish v. Brownlee*, 335 F. Supp. 2d 661, 669 (E.D.N.C. 2004) (similar); *Guerra v. Scruggs*, 942 F.2d 270, 275 (4th Cir. 1991) (similar). And unlike service members with medical or administrative exemptions, Plaintiffs seek to remain in their posts with no change to their duties. The Air Force's judgment that it cannot accept avoidable risk to the health and readiness of its forces serves the public interest, outweighs any interests that Plaintiffs may have in premature preliminary relief, and deserves this Court's deference. *See Navy SEAL 1*, 2022 WL 1294486, at *16–17 (denying preliminary injunction); *Church*, 2021 WL 5179215, at *18–19 (same); *Mark Short*, 2022 WL 1051852, at *9–10 (same); Ex. 31, *Dunn* Op. at 46–47, App.1232–33 (same); *cf. Dunn*, 142 S. Ct. 1707 (declining to enter injunctive relief pending appeal of district court's denial of preliminary injunction motion); *Oklahoma*, 2021 WL 6126230, at *14.

Moreover, the national defense depends on service members' compliance with lawfully issued orders. No military can successfully function where members feel free to define the terms of their own service and which orders they will choose to follow. *See, e.g., Stein v. Mabus*, No. 3:12-cv-00816, 2013 WL 12092058, at *7–8 (S.D. Cal. Feb. 14, 2013) (noting that "[m]ilitary officers are better suited than civilian courts to determine" whether a service member's refusal to "follow all orders from" the Commander-in-Chief "disrupted good order and discipline"); *United States v. Stark*, No.

NMCM200000243, 2000 WL 1456299, at *2 (N-M. Ct. Crim. App. Aug. 31, 2000) (concluding that, upon receiving an order to take the anthrax shot, the service member could not "pick and choose which immunizations he should receive"); *cf. United States. v. Hardy*, 46 M.J. 67, 74 (C.A.A.F. 1997) ("[The notion] that service members need not obey unpopular, but lawful, orders from either their civilian or military superiors . . . would be antithetical both to the fundamental principle of civilian control of the armed forces in a democratic society and to the discipline that is essential to the successful conduct of military operations"). Plaintiffs' requested injunction would harm the public interest in a strong and ready national defense by interfering with the military's clear discretion to handle matters of good order and discipline, to the detriment of military effectiveness and trust between commanding officer and subordinate. *See Chappell v. Wallace*, 462 U.S. 296, 300 (1983); *Orloff*, 345 U.S. at 95.

## IV.    Any Relief Should Be Narrowly Tailored.

Even if the Court were to disagree with Defendants' arguments, the law is clear that any injunctive relief should be no broader than necessary to provide relief to the plaintiffs before the Court. "A plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018); *see also Trump*, 138 S. Ct. at 2425 (Thomas, J., concurring) (explaining the harm of nationwide injunctions). "Narrower injunctive relief is especially appropriate here considering the deference given to military authorities concerning the importance of a particular military interest, the significant public interest in ensuring a strong national defense, and the potential for a wide array of bases for a religious accommodation request." *Poffenbarger*, 2022 WL 594810, at *20 (citing *Winter*, 555 U.S. at 25).

Here, Plaintiffs request a nationwide, Air Force–wide injunction despite the fact that there is no class certified in this suit. Moreover, "[j]udges are not given the task of running the [military]." *Chappell*, 462 U.S. at 301(quoting *Orloff*, 345 U.S. at 93-94); *Larsen v. U.S. Navy*, 486 F. Supp. 2d 11, 36 (D.D.C. 2007) (declining to consider relief that would "assign the Court the role of monitoring [the

Navy's chaplaincy program]") (citation omitted). The programmatic relief Plaintiffs seeks for all airmen would regulate the Air Force's day-to-day procedures for making personnel and assignment decisions intended to protect the health of the force. Such universal or class-wide injunctive relief would be clearly improper—especially before a class has even been certified—even if the Court determined that Plaintiffs were entitled to some individual relief at this stage. *See, e.g.*, *Poffenbarger*, 2022 WL 594810, at *20 ("[T]he Court will only enter a relatively limited preliminary injunction and one that only applies to [the plaintiff.]"). Even if this Court finds the denial of these Plaintiffs' religious accommodation requests warrants relief, the necessarily individualized considerations by the Air Force and the lack of a certified class militates against a nationwide, Air Force–wide injunction.

Moreover, Plaintiffs' broad requested relief directly contradicts the Supreme Court's recent grant of the government's request for a partial stay of a similar injunction in *Navy SEALs 1–26*, 142 S. Ct. at 1302. There, the Supreme Court granted the government's request to partially stay the relevant injunction "insofar as it precludes the Navy from considering respondents' vaccination status in making deployment, assignment, and other operational decisions." *Id.* at 1301. Yet Plaintiffs request this Court enjoin Defendants from a bevy of deployment, assignment, and operational decisions based on failure to receive the COVID-19 vaccine or requesting a religious accommodation from COVID-19 vaccination. *See supra* Part I.C. Even were this Court to disagree with Defendants' arguments, the Court should not issue any relief contrary to the Supreme Court's order.

Far from being tailored to address their own purported injuries, Plaintiffs' request—that the Court issue a nationwide, Air Force–wide injunction covering activities already deemed improper by the Supreme Court—is wholly inappropriate and must be rejected, along with any individual injunctive relief for the Plaintiffs themselves.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for a temporary restraining order and a preliminary injunction.

Dated: June 13, 2022                    Respectfully submitted,

                                        BRIAN M. BOYNTON
                                        Principal Deputy Assistant Attorney General
                                        Civil Division

                                        ALEXANDER K. HAAS
                                        Director, Federal Programs Branch

                                        ANTHONY J. COPPOLINO
                                        Deputy Branch Director
                                        Federal Programs Branch

                                        */s/ Cassandra Snyder*
                                        AMY POWELL
                                        Senior Trial Counsel
                                        CASSANDRA SNYDER
                                        Trial Attorney
                                        Department of Justice, Federal Programs Branch
                                        1100 L Street, N.W., Washington, DC 20005
                                        Tel: (202) 451-7729
                                        Email: cassandra.m.snyder@usdoj.gov

                                        *Attorneys for Defendants*

46

## CERTIFICATE OF SERVICE

I hereby certify that on June 13, 2022, I electronically filed the foregoing paper with the Clerk of Court using this Court's CM/ECF system, which will notify all counsel of record of such filing.

*/s/ Cassandra Snyder*
CASSANDRA M. SNYDER
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel: (202) 451-7729
Fax: (202) 616-8460
Email: cassandra.m.snyder@usdoj.gov

47